Docket No. 108689.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM E. SARGENT, Appellant.

*Opinion filed November 18, 2010.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Burke, and Theis concurred in the judgment and opinion.

## OPINION

Following a jury trial in the circuit court of De Kalb County, defendant, William Sargent, was convicted of predatory criminal sexual assault involving J.W., his minor stepson. In the same proceeding, he was also convicted of three counts of predatory criminal sexual assault and two counts of aggravated criminal sexual abuse involving J.W.'s younger brother, M.G.

On appeal, defendant argued that the circuit court committed reversible error when it failed to tender to the jury an instruction governing hearsay evidence as required by section 115–10(c) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–10(c) (West 2006)). Defendant further asserted that four of his convictions should be reversed on the grounds that the State failed to offer proof of the *corpus delicti* of the crimes. Finally, defendant claimed that seven-year

sentences he received on his aggravated criminal sexual abuse convictions should have run concurrently rather than consecutively to the life sentence he received for his predatory criminal sexual assault convictions.

The State conceded the sentencing error, and the appellate court modified defendant's sentence so that his seven-year sentences would run concurrently with his life sentence. In all other respects, the appellate court affirmed the circuit court's judgment. 389 Ill. App. 3d 904. We granted defendant's petition for leave to appeal. 210 Ill. 2d R. 315. For the reasons that follow, we now affirm in part and reverse in part the judgment of the appellate court. We also affirm in part and reverse in part the circuit court's judgment.

BACKGROUND

The record before us shows that in December of 2004, defendant was charged with one count of predatory criminal sexual assault (720 ILCS 5/12–14.1(a)(1) (West 2004)) for allegedly placing a part of his body in the anus of his minor stepson J.W. In a separate proceeding, he was also charged with three counts of predatory criminal sexual assault for allegedly placing his finger in the anus of another minor stepson, M.G. In addition, he was charged with two counts of aggravated criminal sexual abuse (720 ILCS 5/12–16(c)(1)(i) (West 2004)) for allegedly fondling the penis of M.G. for purposes of his own sexual gratification.

Prior to trial, the State filed notice, in each case, of its intention to offer hearsay statements from M.G. and J.W. pursuant to section 115–10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–10 (West 2006)), which permits, among other things, the admission of hearsay statements made by victims in cases involving sexual abuse of a child. The specific materials which the State sought to admit were a videotaped interview of M.G. conducted by a worker for the Department of Children and Family Services (DCFS) on November 24, 2004; statements made by J.W. to his guardian, a DCFS worker and a police detective in 2004; and separate videotaped interviews which the DCFS worker and the detective conducted with J.W. on December 9, 14 and 29 of 2004.

-2-

Following an evidentiary hearing, the circuit court determined that the boys' out-of-court statements were sufficiently reliable to render them admissible. At the same time, the court denied motions filed by defendant pursuant to section 114–11 of the Code of Criminal Procedure of 1963 (725 ILCS 5/114–11 (West 2006)) to suppress an inculpatory statement defendant had given during an interview at police headquarters prior to his arrest.

The State subsequently filed a motion under section 114–7 of the Code of Criminal Procedure of 1963 (725 ILCS 5/114–7 (West 2006)) asking that the two cases be tried together. The motion was granted by the court over defendant's objection. The court also granted a motion filed by the State under section 115–7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–7.3 (West 2006)) to permit evidence of defendant's criminal conduct with respect to each victim to be admitted in connection with both of the now joined prosecutions.

The matter ultimately proceeded to trial before a jury in February of 2007. The State's first witness was M.G. When M.G. was alleged to have been victimized, he was six years old. By the time trial commenced, he was eight.

On questioning by the State, M.G. testified that he currently lived with "Chad and Mindy." Mindy is his maternal aunt, Melinda. Chad is Mindy's husband. M.G. also stated that he had previously lived with Melissa, who "used to be" his mother, and that Melissa was married to a man named Bill. By Bill, M.G. meant defendant, whose first name is William.

M.G. testified that when he lived with Melissa and Bill, it was in a brick building. The prosecuting attorney asked M.G. whether he remembered Bill "doing anything to [him] that [he] didn't like when [he] lived in that brick apartment." M.G. responded: "I don't remember." With this, direct questioning of M.G. ended. He was not cross-examined.

Joseph Veronda, an Illinois Department of Children and Family Services child protective investigator, was called to the stand next. He testified that he had been asked to interview M.G. in connection with "allegations of possible risk of harm to the child that he may have

suffered while in the custody of his mother." During that interview, M.G. had stated that "he had a secret." At the hearing on the pretrial motion to admit the hearsay statements made by M.G. and J.W., Veronda testified that when he asked M.G. what the secret was, M.G. told him that "Bill had put his finger in [M.G.'s] butt." At trial, Veronda recalled M.G. telling him that "Bill puts Bill's finger in [M.G.]'s butt."

Veronda later interviewed M.G. regarding the allegations, and the State submitted a video of the interview as evidence. In the video, Veronda asked M.G. to tell him about a secret that M.G. and Bill had. M.G. stated that Bill "thought he put his finger in my butt," but that Bill "did not stick his finger in my butt," and that he had "made sure that Bill did not touch my butt." When Veronda asked him if anyone had ever put his finger in M.G.'s butt, he said "No." Eventually M.G. wrote on an easel that Bill "Poot his thigr in my but [*sic*]." M.G. also stated that Bill put his finger in M.G.'s butt and that the incident occurred at their old house, which was brick. Veronda then asked him how many times that had happened, to which he responded verbally and in writing, "I don't know." Veronda asked M.G., "Did it happen one time or more than one time?" M.G. responded by writing the numeral one.

The video of M.G. was followed by testimony from Melissa Sargent, his biological mother. Melissa related that M.G. was born March 3, 1998. He was eventually adopted by her sister, Melinda, and her sister's husband, Chad. Melissa further testified that J.W. was born January 15, 1992, and now lived with his aunt Robin. Melissa initially stated that both boys stopped living with her in March of 2003, when M.G. had just turned five, but admitted during cross-examination that she was not certain whether it was 2003 or 2004 when the boys went to live with their aunts. After the boys moved out, neither ever returned to live with her.

According to Melissa, she married defendant in April of 2002. She was certain of the year because, she recalled, it was the same year her former husband drowned and her father was shot. Melissa recounted that the couple moved into a brick building in DeKalb in March or June of the same year. The couple lived together there until sometime in 2004. She stated that while she was at work during the day, the

boys would be placed in day care or watched by defendant, who worked a night shift. She and defendant are now divorced.

Following Melissa's testimony, the State called Melissa's sister Robin, who was serving as J.W.'s guardian. Robin stated that she was employed as the alcohol, drug and early intervention coordinator for DeKalb County Youth Services, where she also conducted therapy for adolescents and their families. She testified that J.W. first began living with her on a permanent basis in March of 2004. After he moved in, he was diagnosed with Asperger's Syndrome, which she described as an autism spectrum disorder. Because of this condition, he has an extremely difficult time with social situations, does not know how to make friends, and finds it hard to communicate and express his emotions. He does, however, receive good grades in school.

Robin recalled that in December of 2004, Melissa advised her that defendant had been arrested and was in the county jail for allegedly molesting M.G. and J.W. The same evening she received this news, Robin went for a walk with J.W. and the family's dog. During the walk, she asked J.W. if he knew what sexual abuse was. He replied that he did not. Robin then explained to him that "sexual abuse was when anybody touched him on his penis or his butt with their hands or their mouth or if that person had them touch them in those places." Robin recalled that J.W. got quiet. After 5 or 10 minutes passed, she reassured him that "it was okay to tell the truth because he was safe now and he wasn't going to be hurt anymore." J.W. then responded by telling her that defendant had tried to put his penis in J.W.'s "butt" at least once a month, but that he had not touched him in any other way. The next day, Robin spoke with Melissa Garman from the Illinois Department of Children and Family Services about making arrangements for J.W. to be interviewed at the Children's Advocacy Center.

The State next called J.W., who was then 15 and a freshman in high school. J.W. told the jury that before he had gone to live with Robin, he had resided with his mother, Melissa, and defendant in two different places, first on First Street and then in an apartment on Kimberly Drive. J.W. stated that while living in the apartment with his mom and defendant, defendant would try to "stick his penis in my butt." When the prosecuting attorney asked J.W. if defendant had

been successful in doing so, J.W. stated that he had. According to J.W., this happened about once a month beginning when he was in fifth grade, after the family first moved into the Kimberly Drive apartment. The abuse ended when J.W. moved out to live with relatives.

On cross-examination, J.W. stated that the abuse took place in a bedroom of the apartment during times when his mother was at home. He testified that his mother was not present in the room during the abuse, that he did not cry out, and that he could not recall whether he had told his mother about the incidents. He did not discuss the abuse with Robin until approximately a year after he moved in with her. He said he was too nervous to mention it earlier and that it all came out after Robin advised him that defendant had confessed.

The court next heard testimony from Tracy Mueller, a forensic interviewer for the Children's Advocacy Center. Mueller explained that forensic interviews are an investigative tool used to obtain information from children in cases of suspected child abuse. They are conducted in a "child-friendly" environment following a standardized interview process. The interviews are videotaped, with representatives from the local State's Attorney's office, law enforcement, and the Department of Children and Family Services observing from another room.

Mueller stated that she conducted a forensic interview of J.W. in December of 2004. This was not the first time she had met him. She had previously interviewed him in connection with a matter unrelated to the events relevant to this case.

A video of Mueller's December 2004 interview was played for the jury and included in the record. During the interview, J.W. identified defendant as his stepfather and explained that he had previously lived with defendant. When Mueller asked J.W. about defendant, J.W. told her that he would like to put a gun to defendant's head because defendant had abused him "in a sexual way." J.W. recalled that during the first incident, defendant "tried to have sex with him." His mother was not at home at the time, but his little brother, M.G., was.

J.W. stated that the abuse continued and that defendant would come into his bedroom and "tr[y] to put his winkie [ *i.e.*, penis]" in his

butt. J.W. reported that defendant did this approximately once a month. Later in the interview, J.W. told the interviewer that, when he said that his stepfather "tried" to abuse him, J.W. was expressing what he wished had happened (*i.e.*, that he had merely made the attempt but not been successful). J.W. initially denied that defendant had abused him in other ways and said that defendant had never made J.W. touch defendant's penis and that defendant had never touched J.W.'s penis. J.W. later claimed that defendant had, in fact, touched J.W.'s penis and that he had had to touch defendant's penis. J.W. reported that the incidents occurred in his bedroom. His little brother, M.G., was not involved and he never saw defendant touch M.G.'s penis. He did, however, witness defendant strike M.G. on multiple occasions.

As the interview progressed, Mueller again asked J.W. whether defendant had ever touched him on his butt using his penis. J.W. answered in the affirmative, stating that this had happened once. In describing the incident, J.W. said that defendant removed J.W.'s pants, threw his underwear across the room, and put his "private" or "winkie" in J.W.'s butt. According to J.W., defendant's penis touched his butt on the outside. It never touched the inside, but it hurt. J.W. said it was his dream that defendant would be put behind bars.

Detective Mark Nachman of the DeKalb police department testified next. He stated that he had interviewed J.W. on December 29, 2004, and defendant on December 9, 2004. He recounted the circumstances leading to the interviews. With respect to the interview of defendant, Nachman testified that the morning of December 9, he drove to defendant's home and asked defendant to come to the police station to speak with him. Nachman then left, and defendant drove himself to the station.

Nachman stated that after an initial conversation with defendant lasting approximately one-half hour, he began the videotaped portion of the interview. Nachman verified the authenticity of that video recording. The recording was then admitted into evidence and played for the jury.

At the outset of the video, defendant consented to having the interview recorded, and Nachman explained to him that he was not under arrest. Defendant then told Nachman that he had placed his finger in M.G.'s anus 50 to 70 times within the past year or year and

-7-

a half, sometimes while wearing a condom on his finger. He said that the incidents usually occurred in the bathroom but that they sometimes happened in M.G.'s bedroom. Defendant said he engaged in this conduct because his wife would not have anal sex with him. He admitted that it stimulated him sexually.

Defendant told Nachman that there might have been a few times when he touched M.G.'s penis, but that M.G. never touched defendant's penis. Defendant denied putting his penis in M.G.'s butt. He claimed, however, that he had pushed M.G.'s butt with a stick and put a toy car between the cheeks of M.G.'s buttocks. Defendant also recalled that he caused M.G. to watch him masturbate.

With respect to J.W., defendant estimated that he had touched J.W.'s anus with his finger 30 to 40 times, often in the shower, and that he masturbated J.W. 20 times, sometimes to the point of orgasm. Defendant also recalled that J.W. helped defendant masturbate several times. In addition, defendant told Nachman that there were about 20 incidents in which something of a sexual nature happened when J.W., M.G., and defendant were together at the same time. Defendant states that, during those incidents, he sometimes made J.W. and M.G. touch each other's penises. When asked whether Melissa was aware of these activities, defendant responded "maybe," but said she never participated. Defendant denied that there was any oral contact between him and the boys, explaining that "that is going way too far."

The video shows that Nachman left the interview room for a brief period of time. When he returned, he asked defendant about the circumstances of the interview. Defendant stated that everything had been done voluntarily, that he had come to the police station on his own, and that he had understood what Nachman had said to him. After Nachman explained to defendant that he was taking the matter to the State's Attorney's office and that criminal charges would likely be filed, he gave defendant his telephone number and defendant left.

When the videotape concluded, defendant's attorney cross-examined Nachman regarding the interviews with J.W. and defendant. Nachman explained that the videotape of J.W. was actually the second interview J.W. had given. The initial interview was conducted on December 16, but when the interview ended, Nachman discovered that the recording equipment had not worked properly. Due to the

Christmas holidays, they were not able to redo the interview for approximately two weeks. According to Nachman, the second interview was essentially the same as the first.

With respect to the December 9 interview of defendant, Nachman was cross-examined as to how and where the interview was conducted. Nachman explained that while the doors outside the interview room were locked, the door to the interview room itself was not locked. Nachman confirmed that he had told defendant "at all times that he was free to leave," asserted that he would not have arrested defendant if defendant had told him he did not want to continue after their pretaping conversation, and stated that defendant was not, in fact, arrested until the following day.

After Nachman's testimony and presentation of the videotaped interviews, the State called Jacqueline Weber, M.S., as an expert witness on the subject of child sexual abuse accommodation syndrome. According to Weber, the syndrome is a "recognized form of post-traumatic stress disorder" that affects "the typical response pattern of the typical child who has been sexually abused." Weber explained that children who are abused frequently keep the abuse secret. Most, in fact, will never tell at all. Feelings of helplessness are common. Victims are "basically entrapped" by their abusers and are forced to "accommodate in or to survive in that environment." When they do disclose the abuse, the disclosure is often delayed and embellished with unconvincing details, added to permit the child to save face. Weber testified that children who have been abused will also frequently recant their accusations.

On cross-examination, Weber clarified that she had never spoken with M.G. or J.W. and that when she gave her testimony, she was "only talking [o]n a generalized basis." She stated that a diagnosis of child sexual abuse accommodation syndrome is predicated on the assumption that child abuse occurred and "was not developed as a means of detecting abuse."

With Weber's testimony, the State rested its case. Defendant's attorney moved for a directed verdict. When that motion was denied, defendant elected to testify on his own behalf.

On questioning from his attorney, defendant stated that he married

Melissa on April 19, 2002, and lived with her and her two sons, M.G. and J.W. in an upstairs apartment on First Street in the City of DeKalb. They remained in the apartment for about six months, when a fire in a downstairs apartment forced them to move. After staying at an apartment temporarily, they moved into a new apartment on Kimberly Drive. Defendant recalled moving in there on the first of June 2003, and remaining there until the following October, when he "got kicked out for abuse of the kids."

Defendant explained that by "abuse of the kids," he was referring to accusations apparently initiated by his wife that he had been "spanking them and stuff like that." Defendant testified that when he moved in with Melissa, her preferred form of disciplining the children was striking them with her hands and a belt. He told the jury he had simply adopted the same practices because "at that time we wasn't married and it's her household so I was following her rules."

After being kicked out of the apartment, defendant lived separately for a period of time before reconciling with Melissa. He remained with the family in the apartment on Kimberly Drive until April of 2004, when he split up with Melissa and moved elsewhere. While he was back at the Kimberly apartment, defendant was employed as a stock clerk at a discount store, a position he had held since November of 2002. He worked a night shift from 10 p.m. until 7 a.m. He said that he would return home from work around 7:30 or 8 in the morning and go to bed.

According to defendant, the boys were not normally home during the day on weekdays. They were either at the babysitter's house or at school. Melissa would pick them up from the babysitter's on her way home from work. As a result, defendant had little contact with the boys during the day.

On weekends, J.W. spent most of his time at his Aunt Robin's. Defendant and M.G. would watch movies when defendant was not at work. Defendant stated that he did not have a close relationship with J.W., but was more like a dad to M.G. During the interval when he moved out, he had no contact with either child.

Defendant was then questioned about the interview he had with Detective Nachman on December 9, 2004. Defendant recalled that

-10-

Nachman appeared at his apartment before 9 a.m., shortly after defendant had returned from his overnight shift at work. Nachman requested that he come to the police department to answer a few questions, and defendant complied. Defendant stated that he had no clue what Nachman wanted to speak to him about, but suspected it might have to do with his spanking the boys. Nachman eventually told him, however, that the interview was related to allegations that something sexual had happened between defendant and M.G.

Defendant testified that although Nachman told him he was not under arrest and was free to leave at any time, he heard the door to the interview room lock when he entered and assumed that he would have to ask for help if he wanted to go back out. Defendant described the room as very tiny. He said he felt very uncomfortable and scared because he did not know what was going on.

Defendant told the jury that he never placed his finger in M.G.'s anus and that he told Detective Nachman that he had because he was frightened of and intimidated by authority. He said his claim that he had touched M.G. inappropriately 50 to 70 times was something he made up off the top of his head. He fabricated the story because Nachman had told him that "if I would just tell him the truth, whatever, then at the end of the interview I could leave." He said he was scared of being arrested and was just putting on a show.

Defendant denied that he ever touched M.G.'s penis or did anything else with M.G. for purposes of sexual gratification. He said M.G. never watched him masturbate and never touched him while he masturbated. He stated that J.W. would always ask him for soap or a towel while J.W. was in the shower and he would take those items to him. He denied watching J.W. shower, manually stimulating J.W., masturbating in front of J.W., kissing J.W., putting his finger in J.W.'s anus or engaging in any activities with J.W. for purposes of sexual gratification. He also said he never watched pornography with the boys.

The defense concluded with brief testimony from one of defendant's siblings. The State then presented rebuttal testimony from Nachman to clarify a point concerning his interview of defendant in 2004. Following closing arguments, the case was submitted to the jury, which found defendant guilty on all counts. The case was then

set for sentencing.

At the sentencing hearing, the court listened to a victim impact statement written by Robin, J.W.'s aunt and guardian, and heard arguments in aggravation and mitigation by counsel. It then sentenced defendant to a term of natural life imprisonment for the predatory criminal sexual assault convictions pursuant to section 12–14.1(b)(1.2) of the Criminal Code of 1961 (720 ILCS 5/12–14.1(b)(1.2) (West 2006)). The trial court also imposed seven-year terms of imprisonment for the two aggravated criminal sexual abuse convictions, which were to run concurrently to each other but consecutively to defendant's sentence of natural life.

Defendant moved for a new trial, arguing that because of the brevity of its deliberations (under 45 minutes), the jury could not have given adequate consideration to the evidence. Defendant also argued that he was prejudiced by the refusal of jail personnel to permit him to get a haircut and shave prior to trial and by the decision of jailers to transport him to and from jail in a way which may have enabled jurors to seem him wearing his orange jail jumpsuit.

The circuit court denied defendant's new trial motion. Defendant then appealed, raising the points noted earlier in this opinion. The State agreed with defendant's claim that his sentence should be modified, and the appellate court modified the sentence so that the two seven-year aggravated criminal sexual abuse sentences would run concurrently with the sentences for predatory criminal sexual assault. In all other respects, the circuit court's judgment was affirmed. 389 Ill. App. 3d 904. Defendant then petitioned this court for leave to appeal, which we allowed. 210 Ill. 2d R. 315.


ANALYSIS

As grounds for his appeal, defendant first contends, as he did in the appellate court, that the State failed to prove him guilty beyond a reasonable doubt on two of the three counts charging him with predatory criminal sexual assault of M.G. or on either of the two counts charging him with aggravated criminal sexual abuse of M.G. Specifically, defendant argues that the only evidence adduced by the State on those counts consisted of his own, uncorroborated confession

(which he repudiated at trial), and that under established Illinois law, a defendant's confession, standing alone, is not sufficient to prove that a crime occurred.

Under the law of Illinois, proof of an offense requires proof of two distinct propositions or facts beyond a reasonable doubt: (1) that a crime occurred, *i.e.*, the *corpus delicti*; and (2) that the crime was committed by the person charged. *People v. Lambert*, 104 Ill. 2d 375, 378 (1984), quoting *People v. Kirilenko*, 1 Ill. 2d 90, 94 (1953). In many cases, and this is one, a defendant's confession may be integral to proving the *corpus delicti*. It is well established, however, that proof of the *corpus delicti* may not rest exclusively on a defendant's extrajudicial confession, admission, or other statement. *People v. Furby*, 138 Ill. 2d 434, 446 (1990). Where a defendant's confession is part of the proof of the *corpus delicti*, the prosecution must also adduce corroborating evidence independent of the defendant's own statement. *People v. Cloutier*, 156 Ill. 2d 483, 503 (1993). If a confession is not corroborated in this way, a conviction based on the confession cannot be sustained. *People v. Willingham*, 89 Ill. 2d 352, 358-59 (1982).

The corroboration requirement stems from an historical mistrust of extrajudicial confessions. *Furby*, 138 Ill. 2d at 447. Two reasons are commonly advanced for this mistrust: (1) confessions are unreliable if coerced, and (2) for various psychological reasons, persons "confess" to crimes either that have never occurred or for which they are not legally responsible. *People v. Dalton*, 91 Ill. 2d 22, 29-30 (1982).

Although the corroboration requirement demands that there be some evidence, independent of the confession, tending to show the crime did occur, that evidence need not, by itself, prove the existence of the crime beyond a reasonable doubt. If the defendant's confession is corroborated, the corroborating evidence may be considered together with the confession to determine whether the crime, and the fact the defendant committed it, have been proven beyond a reasonable doubt. See *People v. Phillips*, 215 Ill. 2d 554, 576 (2005).

Some authorities have suggested that the corroboration requirement may be satisfied *either* by (1) evidence which substantiates that a crime took place *or* (2) evidence which

corroborates material elements of the confession so as to satisfy the court that the confession was not simply a byproduct of the defendant's imagination. See, *e.g.*, 3 Ill. Jur. *Criminal Law & Procedure* §19:08 (1999). While acknowledging that this court has, itself, made statements in several cases to the effect that "if there is corroborating evidence that tends to confirm the circumstances related in the confession, both can be considered in determining whether the *corpus delicti* is sufficiently proved in a given case," we have specifically held that such statements do "not obviate the requirement that either some independent evidence or the corroborating evidence tend to establish that a crime occurred." *People v. Willingham*, 89 Ill. 2d at 360.

In this case, there is no question that the evidence adduced at trial was sufficient to support defendant's conviction for predatory criminal sexual assault of J.W. The only challenge is to the sufficiency of the evidence with respect to certain of the charges involving M.G. As described earlier in this opinion, defendant was charged with two counts of aggravated criminal sexual abuse of M.G. based on allegations that he had intentionally fondled M.G.'s penis for purposes of his own sexual gratification. Aside from defendant's confession, however, there was no evidence of any kind to corroborate that defendant had, in fact, ever touched M.G.'s penis for any purpose. The only unlawful contact proven by the nonconfession evidence involved defendant's insertion of his finger into M.G.'s anus.

The State contends that evidence of defendant's penetration of M.G.'s anus with his finger and of J.W.'s anus with his penis provides sufficient corroboration that defendant also fondled M.G.'s penis. We note, however, that these were separate acts which gave rise to separate charges. Our precedent demonstrates that under the corroboration rule, the independent corroborating evidence must relate to the specific events on which the prosecution is predicated. Correspondingly, where a defendant confesses to multiple offenses, the corroboration rule requires that there be independent evidence tending to show that defendant committed each of the offenses for which he was convicted. See *People v. Bounds*, 171 Ill. 2d 1, 42-46 (1995).

Such proof is lacking here. As we just noted, aside from

-14-

defendant's confession, no evidence was adduced which tended to support the charges that defendant fondled M.G.'s penis for purposes of his own sexual gratification. There may be circumstances where criminal activity of one type is so closely related to criminal activity of another type that corroboration of one may suffice to corroborate the other, but such circumstances are not present here. See *People v. Richmond*, 341 Ill. App. 3d 39, 46 (2003) (corroboration rule applied to overturn conviction and sentence involving unlawful penis-to-vagina contact, notwithstanding defendant's confession, where corroborating evidence substantiated only penis-to-anus contact). Defendant's convictions and sentences on the two counts of aggravated criminal sexual abuse of M.G. must therefore be reversed.

The corroboration rule is similarly fatal to two of defendant's three convictions for predatory criminal sexual assault of M.G. During his interview with Detective Nachman, defendant confessed to penetrating M.G.'s anus with his finger 50 to 70 times. At trial, however, defendant repudiated his confession, and M.G., himself, testified that he could not remember whether defendant had done *anything* to him he did not like.

The only corroboration that any anal penetration occurred came from extrajudicial statements made by M.G. to Joseph Veronda, the DCFS investigator. At trial Veronda recalled that M.G. had told him that "Bill [*i.e.*, defendant] puts Bill's finger in [M.G.'s] butt." The State suggests that the form of the verb "put" used by Veronda, a form which included the letter "s," tends to confirm that the conduct occurred multiple times. We disagree for several reasons.

First, adding an "s" to a noun makes the noun plural, but adding an "s" to a verb does not make the verb plural. Verbs do not have number. They have tense, mood and voice. See Warriner's English Grammar and Composition 143-61 (rev. ed. 1965). In this version of the statement recalled by Veronda, "puts" is the present indicative form of the verb. It describes something the subject, Bill, does. It does not tell us how often he does it.

While the present indicative form may be employed to indicate habitual action, imputing such an intention to M.G. would be entirely speculative. M.G., after all, was under the age of seven at the time he allegedly made the statement in question. No special expertise is

necessary to appreciate that the language skills of typical children that age are undeveloped and imperfect. Their word choices can be inventive and unorthodox as they struggle to express their thoughts using language tools they do not yet fully grasp. Their understanding of the nuances of English grammar may be many years away. Nothing in the record before us, including the materials M.G. wrote, his testimony at trial or his videotaped interview, suggest his language skills had progressed beyond this basic and formative level.

Second, while Veronda used the word "puts" rather than "put" in relating M.G.'s statements, it is not even clear that his word choice was deliberate. We say this because it conflicts with Veronda's previous testimony in the case. At the pretrial hearing on admissibility of extrajudicial statements made by M.G. and J.W., where Veronda initially related, under oath, what M.G. had told him, Veronda testified that M.G. had said simply that "Bill had put his finger in [M.G.'s] butt," using a form of the word put without an "s." He further testified that after receiving this response, he asked M.G. again about the matter and that M.G. had repeated that "Bill had put his finger in his butt," again using a form of the word put without an "s."

The statements made by M.G. himself during his videotaped interview, which was presented to the jury, corroborated this version of Veronda's testimony. As previously described in this opinion, during the course of the interview, M.G. wrote on an easel that Bill "Poot his thigr in my but [*sic*]" and then stated that "Bill put his finger in my butt," using a form of put without the "s" each time. In addition, when asked by Veronda how many times defendant had put his finger in M.G.'s butt, M.G. responded by writing the numeral one.

In light of the foregoing, there can be no doubt that the evidence clearly corroborated that defendant had used his finger to penetrate M.G.'s anus on one occasion. Equally clear, however, is that there was no actual corroboration for defendant's claim that he had used his finger to penetrate M.G.'s anus more than once. Accordingly, only one of defendant's three convictions for predatory criminal sexual assault of M.G. may stand. The remaining two convictions must be reversed.

The State seeks to avoid this result by arguing that our court should put aside *stare decisis* considerations and abandon the principle that corroboration of a defendant's extrajudicial confession is necessary

-16-

to prove that a criminal offense occurred. We have been invited to abandon the corroboration rule in the past and declined to do so. *People v. Dalton*, 91 Ill. 2d at 29-30; *People v. Lambert*, 104 Ill. 2d at 380-81. The rule has been recognized in this state since the mid-nineteenth century. See *Bergen v. People*, 17 Ill. 425, 427-28 (1856). A hundred and fifty years later, our court has continued to apply it. See *People v. Phillips*, 215 Ill. 2d at 576. The State did not take issue with the validity of the corroboration rule when this case was pending in the appellate court, and it offers no persuasive reasons for why we should break with a century and a half of precedent and jettison the rule today.

Defendant next argues that the circuit court committed reversible error when it failed to tender to the jury an instruction governing hearsay evidence as required by section 115–10(c) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–10(c) (West 2006)). That statute provides:

> "If a statement is admitted pursuant to this Section [governing hearsay exceptions for out-of-court statements made by children or mentally retarded persons who were victims of physical or sexual acts in cases prosecuted under various enumerated statutes], the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, or the intellectual capabilities of the *** retarded person, the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." 725 ILCS 5/115–10(c) (West 2006).

There is no dispute that the case before us was subject to this provision and that the instruction specified by the statute was not given. The record also shows, however, that defense counsel did not ask the trial court to give such an instruction, nor did defense counsel raise the failure to give such an instruction in defendant's posttrial motion.

Supreme Court Rule 366(b)(2)(i) (155 Ill. 2d R. 366(b)(2)(i)) expressly provides that "[n]o party may raise on appeal the failure to give an instruction unless the party shall have tendered it." In addition, our court has held that a defendant will be deemed to have procedurally

defaulted his right to obtain review of any supposed jury instruction error if he failed to object to the instruction or offer an alternative at trial and did not raise the issue in a posttrial motion. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007).

Limited relief from this principle is provided by Supreme Court Rule 451(c) (177 Ill. 2d R. 451(c)), which states that "substantial defects" in criminal jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." In our view, however, this exception is inapplicable to the case before us.

The purpose of Rule 451(c) is to permit correction of grave errors and errors in cases so factually close that fundamental fairness requires that the jury be properly instructed. The rule is coextensive with the plain-error clause of Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), which provides:

> "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."

See *People v. Piatkowski*, 225 Ill. 2d at 564.

The plain-error doctrine is a familiar one. It permits a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d at 565.

As a matter of convention, our court typically undertakes plain-error analysis by first determining whether error occurred at all. If error is found, the court then proceeds to consider whether either of the two prongs of the plain-error doctrine have been satisfied. Under both prongs, the burden of persuasion rests with the defendant. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008).

In this case, there is no dispute that the jury should have been instructed in accordance with section 115–10(c) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–10(c) (West 2006)) and

that sending the case to the jury without such an instruction was a clear and obvious error. The question we must therefore consider is whether either prong of the plain-error test has been satisfied so that we may overlook this procedural default and consider the error on this appeal.

In undertaking our analysis, we consider the error only as it pertains to defendant's conviction for predatory criminal sexual assault involving J.W. and one of the three counts of predatory criminal sexual assault for which he was convicted in connection with M.G. That is so because, as we have just concluded, the remaining convictions, for two counts of aggravated criminal sexual abuse and two of the three counts of predatory criminal sexual assault involving M.G., must be reversed. Regardless of instructional error, those convictions, and their corresponding sentences, cannot stand.

With respect to the first prong of the plain-error doctrine, namely, whether the evidence was "so closely balanced that the error alone threatened to tip the scales of justice against the defendant," we conclude, as did the appellate court, that the evidence was not closely balanced. Defendant's confession and the statements made by J.W. and M.G., when taken together, overwhelmingly established defendant's guilt for one count of predatory criminal sexual assault involving each of the two boys.

The second prong of the plain-error doctrine also offers no relief to defendant. The purpose of this prong of the doctrine is to guard against errors that erode the integrity of the judicial process and undermine the fairness of the defendant's trial. Unlike the first prong, prejudice need not be established. Rather, because of the importance of the right involved, prejudice is presumed. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

The function of jury instructions is to convey to the jurors the law that applies to the facts so they can reach a correct conclusion. The erroneous omission of a jury instruction rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial. *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). This standard is a difficult one to meet. We have noted, for example, that it is not necessarily plain error to omit the definition of a term used to instruct the jury on the essential issue in the case. Even an incorrect instruction on an element of the offense is not necessarily reversible error. *People v. Hopp*, 209 Ill. 2d at 10.

Defendant has failed to persuade us that the absence of the instruction required by section 115–10(c) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–10(c) (West 2006)) severely threatened the fairness of his trial. Defendant cites our decision in *People v. Mitchell*, 155 Ill. 2d 344 (1993), to support his position. In that case we did conclude that the failure to give an instruction pursuant to section 115–10(c) of the Code of Criminal Procedure constituted plain error. As the appellate court in this case correctly observed, however, we found plain error in *Mitchell* based on the first prong of the plain-error doctrine. The evidence was closely balanced. See *People v. Mitchell*, 155 Ill. 2d at 354. We did not hold, directly or indirectly, that plain error would have existed under the doctrine's second prong had the evidence of the defendant's guilt not been so close. See 389 Ill. App. 3d at 919.

We note, moreover, that the jury in this case was not left without direction regarding how it was to approach the victims' statements. Among the instructions it was given was the following:

"Only you are the judges of the believability of the witnesses and the weight to be given to the testimony of each of them. In considering the testimony of any witness you may take into account his ability and opportunity to observe, his age, his memory, his manner while testifying, any interest, bias or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

It is useful to compare this instruction, which was based on Illinois Pattern Jury Instructions, Criminal, No. 1.02 (4th ed. 2000), with the pattern instruction adopted by the Supreme Court Committee on Jury Instructions in Criminal Cases for use where, as here, statements have been admitted under section 115–10(c) of the Code of Criminal Procedure. The pattern instruction states, in relevant part:

"It is for you to determine [whether the statements were made and, if so,] what weight should be given to the statements. In making that determination, you should consider the age and maturity of [the alleged victim], [and] the nature of the statements, and the circumstances under which the statements were made [, and [insert any other relevant factor concerning the weight and credibility of the statements]]." Illinois Pattern Jury Instructions, Criminal, No. 11.66 (4th ed. 2000).

-20-

While the language in these two instructions differs, they convey similar principles regarding the jury's role in assessing witness credibility and the various criteria jurors may consider when making that assessment. Under similar circumstances, where instructions based on Illinois Pattern Jury Instructions, Criminal, No. 1.02, have been given to the jury, our appellate court has held that the failure to also tender an instruction based on Illinois Pattern Jury Instructions, Criminal, No. 11.66, was actually harmless and not even subject to the plain error rule. See *People v. Booker*, 224 Ill. App. 3d 542, 556 (1992); *People v. Richmond*, 341 Ill. App. 3d 39, 50 (2003).

*Dicta* in our decision in *People v. Mitchell*, 155 Ill. 2d at 354-55, can be read to suggest that instructions similar to Illinois Pattern Jury Instructions, Criminal, No. 1.02, may not be sufficient if they do not specifically reference "the weight and credibility to be given the child's statement or *** the age and maturity of the child, the nature of the statement, or the circumstances under which the statement was made." In expressing our views in that case, however, we were concerned not merely by the failure to tender an instruction that followed Illinois Pattern Jury Instructions, Criminal, No. 11.66, but also by the more fundamental failure of the trial court to conduct a hearing, as mandated by section 115–10(b) of the Code of Criminal Procedure of 1963, to determine that the time, content, and circumstances of the victim's statement provided sufficient safeguards of reliability.

That circumstance is not present here. A hearing was conducted pursuant to section 115–10(b) of the Code of Criminal Procedure of 1963, before the jury was allowed to hear and see victims' extrajudicial hearsay statements. In addition, as the appellate court here correctly pointed out, the jury in this case was specifically instructed to take into account the witnesses' ages. Moreover, the directive for the jury to take into account the nature of the statement, or the circumstances under which the statement was made, seems implicit in the instruction it did receive "to take into account [the witnesses'] ability and opportunity to observe *** and the reasonableness of his testimony considered in the light of all the evidence in the case." See 389 Ill. App. 3d at 921. We also agree with the appellate court that while the jury was not specifically instructed on the victims' videotaped statements, which were not technically testimony,

> "the statements were played for the jury during the testimonial portion of the trial (and as part of the testimony of the

interviewers to whom the boys made the statements), and they had the same effect–allowing the jury to hear the [victims'] accusations in their own words–as testimonial evidence." 389 Ill. App. 3d at 921.

Under these circumstances, it seems highly likely that the jury understood that the victims' videotaped statements fell within the terms of the instruction it received based on Illinois Pattern Jury Instructions, Criminal, No. 1.02.

In reaching this conclusion, we do not mean to suggest that courts have the discretion to tender instructions based on Illinois Pattern Jury Instructions, Criminal, No. 1.02, rather than Illinois Pattern Jury Instructions, Criminal, No. 11.66, in cases where hearsay statements have been admitted pursuant to section 115–10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–10 (West 2006)) and defendant requests that the jury be instructed in the manner required by that statute. We hold simply that, under the facts of this case, the court's failure to instruct the jury as set forth in section 115–10 of the Code of Criminal Procedure did not constitute plain error.

## CONCLUSION

Defendant was properly convicted of predatory criminal sexual assault of J.W. and one count of predatory criminal sexual assault of M.G. No basis exists for disturbing the sentence of natural life imprisonment he received for those convictions pursuant to section 12–14.1(b)(1.2) of the Criminal Code of 1961 (720 ILCS 5/12–14.1(b)(1.2) (West 2006)). Defendant's convictions on the remaining charges against him cannot be sustained under the corroboration rule, which remains the law of Illinois. Those convictions and the corresponding sentences imposed for those convictions are therefore reversed.

For the foregoing reasons, the judgment of the circuit court of De Kalb County is affirmed in part and reversed in part. The judgment of the appellate court is reversed in part and affirmed in part.

*Appellate court affirmed in part and reversed in part;*
*circuit court affirmed in part and reversed in part.*