2021 IL App (2d) 190205-U
No. 2-19-0205
Order filed June 3, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16-CF-2704 |
| | ) | |
| GEORGE W. PIERCE III, | ) | Honorable |
| | ) | Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's statements to police at the scene of his arrest were not statements in anticipation of plea negotiations and, thus, the trial court did not err in admitting them. First, defendant's statements did not manifest a subjective intent to enter into plea negotiations. Second, even if his statements could be so construed, it would be objectively unreasonable for defendant to believe that the police had the authority to undertake plea discussions in the immediate aftermath of defendant's arrest. Therefore, we affirmed the judgment.

¶ 2    At issue in this appeal is whether statements defendant, George W. Pierce III, made to police officers as they prepared to transport defendant to the police station were barred under Illinois Supreme Court Rule 402(f) (eff. July 1, 2012) because the statements were made in

anticipation of plea negotiations. We determine that the statements were not made in anticipation of plea negotiations and that, thus, they were properly admitted. Accordingly, we affirm.

¶ 3                                                    I. BACKGROUND

¶ 4        Before trial, defendant filed a motion *in limine*, seeking, among other things, to bar the State from playing at trial "any squad video or body worn camera which contains immaterial, irrelevant and prejudicial images or statements by police officers, dispatch, the defendant's children or the defendant." The motion was not more specific about the video content.

¶ 5        At a hearing on the defendant's motion, defense counsel commented there was a large amount of body-camera video. Counsel proposed that the State identify which parts it intended to introduce. The State remarked:

> "The defendant made some statements on that body camera, including some statements that counsel alluded to regarding making a deal. And the State would draw a conclusion making a deal in reciprocation for getting him an easier—sentence on whatever he's dealing with. Consciousness of guilt, [Y]our Honor. That's a body camera video we do intend to introduce."

The State elaborated that, as defendant was placed in a squad car, he made a number of "spontaneous utterances," "offering to do some drug deals in exchange—well, in exchange for leniency." Defense counsel responded:

> "With regards to the statements that's on the body camera regarding making a deal, there was an agreement. I agreed a hundred percent. So, based on that, I don't have any issue with that being played."[1]

_____

[1] Neither party has explained what this agreement entailed, and this court has not found

The trial court denied in part defendant's motion *in limine* and allowed the State to present at trial the body-camera video recording of the exchange between defendant and the officers that arrested him.

¶ 6     Evidence presented at trial revealed that, on the afternoon of October 9, 2016, Rafael Arroyo, who was 63 years old, was working in his yard with his grandson, Joel Montes, whom Arroyo believed was involved in a gang.  While the two were working, Arroyo saw defendant looking over the fence that separated Arroyo's property from the neighboring alley.  Defendant was standing on one of the posts that Arroyo installed next to the alley to prevent cars from hitting the fence while driving through the alley.  Arroyo testified that defendant, while standing on one of these posts, fired two shots at Arroyo and then fired another two shots at Joel.

¶ 7     Wesley Montes, Arroyo's son-in-law who lived upstairs with his family in Arroyo's house, heard gunshots being fired and looked out the window.  He saw defendant and defendant's son, Anthony Pierce, standing on two of the posts that abutted the alley.  Wesley saw Anthony, who he knew was a gang member, fire a gun at Arroyo and then at Joel, who Wesley knew was a member of a different gang.

¶ 8     Video surveillance of the area showed that three people were milling around in the area. One of them, who is wearing clothes resembling what defendant was wearing that day, is seen running down the alley, pointing a gun behind him and firing.

¶ 9     After the shooting, defendant and Anthony fled the scene.  Both men were apprehended a short distance away from Arroyo's home.  The gun used in the shooting was found in the area where defendant was apprehended.  Shell casings fired from that gun were discovered in the alley

_____

anything in the record that clarifies what the terms of this agreement were.

next to Arroyo's property. No shell casings or projectiles were found in Arroyo's yard. There was possible gunshot damage in the yard, but no effort was made to determine if its source was the gun found near defendant. Moreover, no gunshot residue was found on defendant or Anthony, and no latent fingerprints were found on any parts of the gun that was discovered near defendant.

¶ 10 After defendant was arrested, two policemen escorted defendant to the squad car that took him to the police station. One of the officer's body cameras recorded the exchange between the officers and defendant. In this recording, a dog is incessantly barking, and people are standing outside of their homes. An officer conducts a pat-down search, and defendant asks the officers numerous times about getting a cigarette, inquires about the location of his wallet and cellphone, and asks one of the officers if he can have his sunglasses. Soon thereafter, while one of the officers is struggling to secure defendant in a seatbelt, feeling behind defendant for the seatbelt-locking mechanism, defendant asks, "So now what? We make a deal or what?" The officer trying to secure defendant's seatbelt responds, "Yeah, we'll all talk about everything." After a brief pause, defendant asks, "What do you guys want? Cocaine? What do you got?" The same officer responds, "There's too many people here right now, okay?" Defendant replies, "Alright."

¶ 11 In his closing argument, defendant argued that he was not the shooter, and even if he did fire the gun, he did so in self-defense. In response to this self-defense theory, the State argued in rebuttal:

> " 'Let's make a deal.' 'You want some cocaine?' Okay. If you're to take the defendant at—for his defense of self-defense, you get picked up and you get put in a squad car, is the first thing you say to the officers that are taking him in there, 'Let's make deal,' or do you bring up the fact, 'Hey, I was shot at, why am I sitting in a squad car?'

His first reaction is, 'I'm in trouble, I better make a deal here. Want me to go make some cocaine deals for you?' That is the reaction of somebody who is conscious of their [*sic*] guilt. And he knew he was in trouble."

¶ 12 The jury found defendant guilty of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)) and unlawful use of a weapon by a felon (*id.* § 24-1.1(a)). He was sentenced to concurrent terms of 14- and 20-years' imprisonment. At no point during the proceedings in the trial court did defendant argue that the statements he made to the police before he was transported to the police station were inadmissible.

¶ 13 This timely appeal followed.

¶ 14 II. ANALYSIS

¶ 15 At issue in this appeal is whether the statements defendant made to the police were barred by Rule 402(f) because they were made in anticipation of plea negotiations. Before considering this issue, we *sua sponte* raise the doctrine of invited error. Under that doctrine, a defendant may not acquiesce to the trial court's proceeding in a given manner and then, on appeal, contend that that very course of action was in error. *People v. Carter*, 208 Ill. 2d 309, 319 (2003). "To allow [a] defendant to object, on appeal, to the very [procedure] he *requested* at trial, would offend all notions of fair play." (Emphasis in original.) *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001).

¶ 16 We are disinclined to find that defendant invited the error he raises on appeal. The State does not suggest that defendant invited the error, and we do not know precisely what "agreement" defense counsel was referencing at the hearing on defendant's motion *in limine*. Moreover, invoking invited error would not provide the State any real benefit, as defendant's underlying argument lacks merit. *Infra* ¶¶ 25-27. We caution the parties to raise such equitable principles in

the future where they are believed to apply, but here we hold that the invited-error doctrine does not bar our consideration of the issue.

¶ 17     Turning to the issue defendant raises, we observe that defendant did not object during the trial proceedings or in a written posttrial motion that the statements he made to the police were barred under Rule 402(f).  Defendant raises his challenge for the first time on appeal.  "[B]oth a trial objection and a written post-trial motion raising the issue are necessary to preserve an issue for review." *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).  When a defendant neglects one or both steps, the issue is forfeited.  *Id.*

¶ 18     Defendant recognizes that he forfeited any claim that his statements should not have been admitted.  He asks this court to consider the issue under the plain-error rule, which bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in limited circumstances.  *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).  Specifically, the plain-error doctrine permits a reviewing court to consider an unpreserved error when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189 (2010).

¶ 19     Defendant argues that review of the issue he raises on appeal is appropriate under the first prong of the plain-error rule, *i.e.*, that "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Id.*  We must first determine whether any error arose at all.  *Id.*

¶ 20    Resolving whether the admission of the statements was erroneous begins with examining Rule 402(f). That rule provides that "[i]f a plea discussion does not result in a plea of guilty, *** the plea discussion *** shall [not] be admissible against the defendant in any criminal proceeding." Ill. S. Ct. R. 402(f) (July 1, 2012). "The purpose of Rule 402(f) is to encourage the negotiated disposition of criminal cases through elimination of the risk that the accused's statements or concessions made during the course of plea discussions could be used against him." *People v. Neese*, 2015 IL App (2d) 140368, ¶ 11.

¶ 21    That said, "not all statements made by a defendant in the hope of obtaining a concession constitute plea discussions." *Id.* ¶ 12. "Indeed, there is a difference between a statement made during the course of a plea discussion and an otherwise independent admission, the latter of which is not excluded by Rule 402(f)." *Id.* Deciding whether a defendant's statements fall under Rule 402(f) turns on the specific facts of each case. *Id.* Courts should "consider the nature of the statement, to whom the defendant made the statement, and what was said by the parties to the conversation." *Id.*

¶ 22    Police officers are one group of people defendants may make statements to in anticipation of plea negotiations. "Courts should resist an approach that characterizes every conversation between a defendant and the police as a plea negotiation." ¶ 14. "[A]ny person who voluntarily speaks to the police probably hopes to benefit therefrom." *Id.* "Those facing criminal prosecution often seek leniency, and thus not all attendant statements made in the hope of obtaining concessions are plea-related statements under Rule 402(f)." *Id.* As a result, "Rule 402(f) was not intended to exclude as evidence mere offers to cooperate with the police, at least where such offers are not accompanied by the rudiments of the plea-negotiation process." *Id.* ¶ 13. "One such

rudiment, for example, would be the defendant's willingness to enter a guilty plea in return for concessions by the State." *Id.*

¶ 23    Although determining whether a defendant's statements fall under Rule 402(f) does not involve the application of a bright-line rule, our "supreme court has recognized a two-part test for deciding whether particular statements are plea-related." *Id.* ¶ 15. First, "[t]he court must consider *** whether the defendant had a subjective expectation to negotiate a plea." *Id.* ¶ 15. "[S]econd, [the court must consider] whether any such expectation was objectively reasonable under the totality of the facts." *Id.* "Where the defendant's subjective expectations are not explicit, the objective circumstances surrounding the statements take precedence in evaluating whether the statements are plea-related." *Id.* Further, "[a]lthough there is no required demarcation indicating the beginning of plea discussions, it must be clear that the defendant actually intended to plead guilty in exchange for a concession by the State, and such intent must be objectively reasonable." *Id.*

¶ 24    In reviewing whether a defendant's statements fell under Rule 402(f), we apply a bifurcated standard. We greatly defer to the court's factual findings and will not reverse those findings unless they are against the manifest weight of the evidence. *Id.* ¶ 10. However, we review *de novo* the ultimate question of whether defendant's statements were made in anticipation of plea negotiations. See *id.* ¶ 10 (reviewing *de novo* the admissibility of statements under Rule 402(f)).

¶ 25    Here, under the two-part test delineated above, defendant's statements to the officers were not related to a plea. First, no evidence indicated that defendant subjectively believed that he was involved in any type of plea discussion. In speaking with the officers, defendant never mentioned a plea or expressed a desire to plead guilty. He did not explain to the court why he made the statements that he did. The only reasonable conclusion that can be drawn from defendant's first

comment—"So now what?"—is that he wanted to know what was going to happen next. The mere fact that defendant mentioned "mak[ing] a deal" does not transform his statements into a discussion about pleading guilty. See *People v. Tennin*, 123 Ill. App. 3d 894, 897 (1984) (the defendant's statement, " 'I want to make a deal,' " did not "indicate any explicit offer to plead guilty," and nothing indicated what the defendant's subjective intent was in making the statement). Similarly, defendant's statements about what the officers wanted, whether they were looking for cocaine, and what they had is not evidence that defendant wished to enter a plea of guilty to any charges. When defendant asked those questions, the officers were struggling to secure defendant with a seatbelt, searching behind him for the seatbelt-locking mechanism. Given the circumstances, defendant may have been inquiring about the object of what defendant perceived was a further search, or he could have been asking about what the officers had already found. Even if defendant asked these questions because he wanted to cooperate with the police by serving as an informant in exchange for leniency, that is not evidence that defendant was seeking to initiate plea discussions. See *People v. Ward*, 192 Ill. App. 3d 544, 553-54 (1989) ("[A]lthough [the] defendant indicated that he had information about narcotics dealers, the record is unclear as to the purpose he was offering the information. [The d]efendant never stated or otherwise indicated that he was willing to plead guilty to the charge against him.").

¶ 26    As to the second part of the test, even if defendant had a subjective expectation of negotiating a plea, which we do not believe that he did, that expectation was not objectively reasonable given the totality of the facts. Specifically, nothing about defendant's conversation with the police would indicate to a reasonable person in defendant's position that the police had the authority to (1) engage in plea discussions, (2) offer a deal to plead guilty, or (3) enter into a plea agreement. The police never expressed that they had any such authority, mentioned a plea

during their conversation with defendant, or implied that they could negotiate a plea. The officers did tell defendant that they would "all talk about everything," in response to defendant's question about whether making a "deal" or something else would happen next. However, that does not suggest that the police had the authority to negotiate, offer, and accept a plea. Rather, this exchange between defendant and the officers, right after defendant was arrested, would suggest to a reasonable person in defendant's position that any discussion about the next steps in the process—even if they included some type of plea discussion—would happen at a later point. Any expectation by defendant of negotiating a plea right then would not have been objectively reasonable.

¶ 27    Accordingly, we conclude that the second part of the test, like the first part, was not met here. As a result, admission of the statements was not improper under Rule 402(f). Because admission of the statements was not error, defendant cannot establish plain error, and the forfeiture stands. *People v. Hart*, 214 Ill. 2d 490, 513 (2005).

¶ 28    Our determination that the statements were not barred by Rule 402(f) is not altered by the State's remark in rebuttal that defendant wished to make a deal and that this showed defendant's consciousness of guilt. The State never argued to the jury that defendant offered to plead guilty or wished to enter into plea discussions. Rather, the State argued that defendant's offer to cooperate with the police showed his consciousness of guilt. As our supreme court has observed, "a defendant might choose to offer cooperation to a police officer for a variety of reasons." *Id.* at 512. But, "without a reasonably specific reference to a defendant's willingness to either negotiate or enter a guilty plea, neither evidence of a defendant's willingness to cooperate, nor prosecutorial comments thereon, [including an inference that defendant's willingness to cooperate with the police showed a consciousness of guilt,] violate Rule 402(f)." *Id.*

¶ 29 Moreover, we find inapposite defendant's claim that the State "understood this clearly" that defendant wished to negotiate a plea when it told the court during pretrial proceedings that "the State would draw a conclusion [that defendant was] making a deal in reciprocation for getting him an easier sentence on whatever he's dealing with." Aside from the fact that that argument was never made before the jury and the State's assertion is somewhat equivocal, the State's subjective belief about what defendant's statement meant is simply immaterial. See *People v. Victory*, 94 Ill. App. 3d 719, 721, 725 (1981) (the defendant's statements to police that (1) " 'he realized [that he was facing] a Class X felony,' " (2) " 'he could get a maximum of 30 years' " for a Class X felony, (3) he could not " 'afford to take' " a Class X charge, (4) " 'he would accept 10 years' " and (5) " 'would the State's Attorney be willing to plea bargain' " were admissions of guilt and not requests to plea bargain; therefore, their introduction at the defendant's bench trial, where the trial court relied on them, did not violate Rule 402(f)). If such statements are not improper under Rule 402(f), it makes no difference what the State subjectively believed regarding those statements.

¶ 30 Relying on *People v. Friedman*, 79 Ill. 2d 341 (1980), defendant argues that his statements to the police should not have been admitted. There, the defendant was indicted in federal and state court for offenses arising out of inducing unsophisticated investors to invest in various marketing enterprises. *Id.* at 344, 346. Approximately one month after the defendant was indicted, the defendant phoned an investigator with the Attorney General. *Id.* at 349-50. The defendant, who had spoken to the investigator about his indictment three times before he called, left a message indicating that he needed to talk to the investigator about a " 'very urgent' matter." *Id.* at 350. When the investigator called the defendant back, the defendant asked the investigator about " 'making a deal' " and asserted that, if he was convicted, he would rather serve his time in federal prison, not state prison. *Id.* at 350. On appeal, the defendant argued that the statements to the

investigator should not have been admitted, as they were made in anticipation of a plea agreement and so fell under Rule 402(f). *Id.* Our supreme court agreed. *Id.* at 352. The court noted that "[b]efore a discussion can be characterized as plea related, it must contain the rudiments of the negotiation process, *i.e.*, a willingness by [the] defendant to enter a plea of guilty in return for concessions by the State." *Id.* at 353. The court determined that the "defendant's unsolicited statement was an offer to enter negotiation, stating generally the terms upon which [the] defendant would be willing to bargain." *Id.* at 352.

¶ 31 The same cannot be said here. Although, like the defendant in *Friedman*, defendant here referred to making a "deal," nothing indicated that the deal here concerned pleading guilty to any offense. Unlike the defendant in *Friedman*, where the defendant had spoken to the investigator about his charges numerous times after he was indicted, defendant's statements here were made to the police who arrested him at the scene before defendant was officially charged with anything. Moreover, unlike the defendant in *Friedman*, defendant here never expressed any terms of a plea agreement he would consider. Rather, defendant's questions about what the officers wanted were, at best, an offer to serve as an informant for the police. Nothing in the entire encounter intimated that defendant wished to broker a deal with the State whereby defendant would plead guilty in exchange for certain concessions from the State, such as where he would serve his sentence if he were convicted.

¶ 32                                    III. CONCLUSION

¶ 33 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 34 Affirmed.