# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Marcos, 2013 IL App (1st) 111040**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAIME MARCOS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-1040 |
| Filed | August 16, 2013 |
| Rehearing denied | August 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction for the predatory criminal sexual assault of his then live-in girlfriend's eight-year-old daughter, the trial court's error in failing to give the pattern instruction required when the child's sexual-assault outcry statements are admitted under section 115-10 of the Code of Criminal Procedure was not plain error, since the evidence against defendant was not closely balanced, and his counsel's failure to request the instruction did not amount to ineffective representation in the absence of any reasonable probability that the result would have been different if the request had been made. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-811; the Hon. Noreen Valeria-Love, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on Appeal    Michael J. Pelletier, Alan D. Goldberg, and Jennifer L. Bontrager, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People.

Panel    JUSTICE GORDON delivered the judgment of the court, with opinion.

Presiding Justice Lampkin and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Jaime Marcos was convicted after a jury trial of three counts of predatory criminal sexual assault against eight-year-old G.M., who was the daughter of his then live-in girlfriend. Specifically, he was charged with one count of contact between his penis and her anus, and two counts of contact between his tongue and her anus. After hearing factors in mitigation and aggravation, the trial court sentenced defendant to 3 consecutive 6-year sentences for a total of 18 years in the Illinois Department of Corrections (IDOC).

¶ 2    On this direct appeal, defendant raises two claims. First, he argues that the trial court erred by failing to instruct the jury with Illinois Pattern Jury Instructions, Criminal, No. 11.66 (4th ed. 2000) (herinafter, IPI Criminal 4th No. 11.66), which is required whenever a trial court admits into evidence a child's sexual-assault outcry statements pursuant to section 115-10 of the Code of Criminal Procedure of 1963 as an exception to the hearsay rule. 725 ILCS 5/115-10(c) (West 2006). The issue before us is limited to whether this error rises to the level of plain error or whether it would support the conclusion that defendant's trial counsel was constitutionally ineffective for failing to raise it. There is no dispute that the trial court was required by statute to give the instruction, and defendant concedes in his brief to us that he waived this issue for consideration on appeal by failing to ask the trial court to give the instruction. With respect to plain error, defendant argues that the evidence was closely balanced only with respect to the two mouth-to-anus counts. Thus, the one penis-to-anus count is not at issue on this appeal.

¶ 3    This issue requires us to interpret and apply the Illinois Supreme Court's holding in *People v. Sargent*, 239 Ill. 2d 166, 190 (2010), that a trial court's failure to give IPI Criminal 4th No. 11.66 did not rise to the level of plain error, because the evidence of predatory criminal sexual assault in that particular case was overwhelming. Our opinion today is the first published appellate court opinion to interpret and apply this holding in *Sargent*. Although many other cases have cited *Sargent*, they cite it for other propositions, such as a general statement of the plain error rule or a statement of the *corpus delicti* rule. None of the published cases interpret or apply this particular holding.

¶ 4    Secondly, defendant claims, and the State agrees, that he is entitled to an additional day of credit for time served. For the following reasons, we affirm defendant's conviction but order the mittimus corrected to reflect an additional day of credit for time served.

¶ 5                                    BACKGROUND

¶ 6    Prior to trial, the State moved to admit into evidence the victim's hearsay outcry statements both to her mother and to Thomas Plach, a licensed clinical social worker, pursuant to section 115-10 of the Code of Criminal Procedure of 1963. After a hearing, the trial court granted the motion and found that both statements were admissible. This order of the trial court is not at issue, since defendant argues on appeal only that the required jury instruction should have been given once the statements were admitted.

¶ 7    At trial, the State called four witnesses: (1) G.M., the victim, who was then 11 years old; (2) A.M., the victim's mother, who heard G.M.'s initial outcry; (3) Maria Salynas, who acted as the Spanish translator for G.M.'s subsequent statement to social worker Thomas Plach; and (4) Detective Carlos Paloner, who speaks both English and Spanish and who memorialized defendant's statements in Spanish in a typed document. As we explain below in the analysis section, we are called upon in this appeal to determine whether the evidence was closely balanced. Since there is no physical evidence and the State's evidence consisted primarily of statements made, we describe these statements in detail below, to show the similarity in the accounts provided by the victim at trial; the victim's hearsay outcry statements to her mother and to a social worker; and defendant's statements to the police.

¶ 8    The State's first witness, G.M., chose to testify in English. Although she first learned Spanish, she now also speaks English. G.M. identified defendant in court as her mother's boyfriend and explained that he "did something bad" to her in the autumn of 2007 in her home in Cicero, when she was eight years old. It was at night, and her mother was not home. G.M. was lying on a bed in the middle of the living room with defendant and her baby brother, and she was in between them. She was pretending to be asleep, when defendant pulled off her pants and underwear and "he put his tongue on my–on my vagina" and "licked the front." G.M. did not move because she was scared. Then he "put his penis in my butt" and moved "[b]ack and forth" until she felt "[s]omething slippery." G.M. explained that the word for penis in Spanish is "pollo." Then he pulled her pants and underwear up and went to the bathroom.

¶ 9    G.M. testified that it happened again but she did not remember how many days later. The second time, she was at home with her younger sister, her baby brother and defendant, and her mother was out buying milk. It was at night, and she was lying on the bed in the living room with defendant, her baby brother and her younger sister, and she was lying next to defendant as she pretended to be asleep. Defendant pulled off her pants and underwear, "and he put his lips on my vagina" and "licked it." Then "he put his penis on my butt" and "moved back and forth," and "it hurt." She did not say anything because she was scared. Then he stopped and pulled her pants and underwear up, and her mother came home. G.M. did not tell her mother because she was scared of defendant.

¶ 10    G.M. testified that sometime later–she does not remember exactly when–she did tell her

mother. Her mother had gone into the kitchen to heat some milk for her baby brother, and everyone else was asleep in the living room. G.M. told her mother that defendant was a pig and that he had pulled off her pants and underwear and done "something bad." Her mother told her not to cry and hugged her. G.M. admitted that she was crying "a little." Then G.M. drew a picture of what had happened, and her mother ripped up the picture and threw it in the garbage. Later that day, her mother called the police, and G.M. spoke to a man and a woman. G.M. could not remember whether she spoke to the man and woman in Spanish, but she testified that the Spanish word for vagina is "cosita," that a "cola" is "a man," and that she called her butt "nalgas."

¶ 11    At the end of her direct examination, G.M. testified that, after defendant placed his penis into her butt, she felt "something hot" and sticky, and she felt pain. She felt his penis going into her buttocks. When he licked her private parts, she could feel his tongue going into her.

¶ 12    During cross-examination, G.M. testified that she did not remember when defendant came to live with them and she called him "Jaime" not "dad." There were two rooms in their home: a kitchen and a living room. When she went to sleep, she wore her clothes, not pajamas. She did not observe her mother and defendant fighting, and defendant never hit her. Although defendant hurt her during these incidents, she did not yell or cry. She did not remember when police officers came to speak with her, but she did remember speaking to prosecutors this morning.

¶ 13    A.M., the victim's mother, testified that she was 32 years old, that she was born in Mexico and that she speaks Spanish. A.M. testified through a Spanish interpreter. In December 2007, she had been dating defendant for almost five years, and they lived in a house in Cicero with her four children. Defendant was the father of her two youngest children, but he was not the father of G.M. or G.M.'s older brother. Defendant worked, and A.M. stayed at home to care for the children. As a result, it was rare for her to leave defendant alone with the children.

¶ 14    A.M. testified that their house in Cicero had two bedrooms, a living room and a kitchen. On Sunday, December 2, 2007, except for G.M.'s oldest brother, the entire family was sleeping on a mattress on the floor of the living room because the heaters in the other rooms were not working. On that Sunday morning, A.M. woke up because G.M.'s baby brother was crying, and A.M. went to the kitchen to fix him a bottle. G.M. followed her into the kitchen, and A.M. observed that G.M. was "nervous, worried, afraid, and she had tears in her eyes." A.M. asked what was wrong, and G.M. said that she wanted to tell A.M. something but she did not want A.M. to be angry with her. They started to talk, and G.M. said " 'Mama, your boyfriend Jaime is dirty. He's a pig.' "

¶ 15    A.M. testified that defendant acted like a stepfather to G.M. since she had little contact with her biological father. A.M. was thinking about marrying defendant, and she believed that their relationship was fine. After G.M. called defendant a pig, A.M. asked her what she meant and G.M. replied that he had done "dirty things" to her. This conversation occurred while A.M. was walking back and forth between the water heating in the kitchen and the baby, who was still in the living room. A.M. was very tired because the baby was not letting her sleep much. When G.M. told her that, A.M. felt like "the world was falling on top of me.

I couldn't breathe, and I started seeing fuzzy," but she kept talking with G.M.

¶ 16    A.M. testified that she was speaking with G.M. in Spanish and she asked G.M. to draw her a picture. G.M. drew a picture with two stick figures, one standing and one lying down. "The one that was standing up had this big tongue over the private parts of the one that was lying down." G.M. said that the figure with a large tongue was defendant, and that she was the other figure. G.M. stated that he had placed his tongue in her private parts and licked her, and that he had pulled her pants down when she was sleeping. G.M. also stated that he hurt her when he put his penis "in the back" and moved. G.M. stated that she pretended to be asleep because she was scared. G.M. used the words "cola" and "nalgas" to describe her rear.

¶ 17    A.M. testified that she was shaking and felt desperate, and she did not know what to do. She told G.M. not to cry, hugged her, and told her it was not her fault. A.M. was crying, and she felt like it was her own fault because she had gone to therapy for her depression, and she had never left G.M. alone with defendant before. A.M. asked G.M. to forgive her, and G.M. said no mom, it was not your fault, it was defendant's fault. During this conversation, defendant was still fast asleep on the mattress. G.M. had not told A.M. about these events for two months. G.M. said that they had happened when A.M. had left the house to go to therapy, to pick up money from G.M.'s father and to buy milk for the baby.

¶ 18    A.M. testified that she did not have a telephone in the house or a vehicle and her cellular phone was out of service. At some point during the day, A.M. woke up defendant and told him that G.M. had said "something very serious." At first, he denied it. However, eventually he admitted that he licked G.M.'s "nalgas" or rear, but he denied having placed his penis in her anus. Defendant stated that, if they stayed together "who knows if this will happen again," and he acted "like it was no big deal." A.M. had a small tape recorder in the house and she tried to record the conversation. Later she gave the tape cassette to the police and she never had an opportunity to determine if she was successful.

¶ 19    A.M. wanted to hit him but she thought if she did that, he would run and the police would not be able to nab him. So, instead, she told him that she was going to buy milk. She took G.M. and her other daughter with her, and she called 911 on her cellular telephone after she left the house. Although the cellular telephone had no service, it could still call 911. After the 911 call, several police vehicles arrived and the officers asked her to enter a police van, since it was cold outside. After A.M. told them what had happened, the police arrested defendant and transported A.M. and all four of her children to a police station.

¶ 20    A.M. testified that the next day she took G.M. to meet with a social worker named "Mr. Black"[1] and a woman named Maria. While they were speaking, A.M. waited in another room with her other children. At some point, A.M. received some letters from defendant, whose handwriting she recognized. Although she read and tore up the first ones, she did give the last one to the State's Attorney's office and it was admitted into evidence at trial. In the middle of the letter is a drawing of a hand, and it asks G.M. to forgive him. It states in part: "Forgive me a thousand pardons."

¶ 21    On cross-examination, A.M. testified that defendant worked but he did not want A.M.

---

[1]The social worker's last name was actually "Plach" not "Black."

to work outside the home. Sometimes there was not enough money, so G.M.'s biological father would occasionally provide money. In October 2007, G.M. had a party for her eighth birthday, but G.M.'s biological father did not attend. Except for her oldest son, the family had been sleeping together in the living room for almost five months because the furnace was not working. They had moved to this house in August 2007 before the children started school, and the furnace had stopped working right after they moved in.

¶ 22    A.M. testified that her mother lived with them before they moved and, thus, when A.M. attended her prior therapy sessions for depression, A.M.'s mother watched the children. However, her mother did not move with them to the new place. As a result, A.M. left the children with defendant, but this happened only twice: once when she went to a therapy session; and once when she went to buy milk. She did not recall the exact date of this therapy session, but the therapy lasted only three months and the last session was in October 2007. Then two months went by, and G.M. told her what happened in December 2007. When A.M. went to her last therapy session, defendant insisted that she take her oldest son with her because "he has a real short fuse." Her oldest son was then nine years old. She did not remember exactly when that last session started, but usually her sessions started between 5 and 7 p.m. The second time she left defendant with the children, her oldest son also went with her. It was at night, and they walked three blocks to purchase milk.

¶ 23    A.M. testified that, when it is cold, G.M. wears a pajama top and her pants to bed. On the morning of December 2, 2007, she woke up early, when it was still dark outside and went to the kitchen. When G.M. drew a picture, it made A.M. so angry that she ripped the picture into little pieces. After G.M. spoke to her, A.M. went to her bedroom to retrieve a tape recorder out of a drawer because she wanted to secretly record defendant. She observed a cassette in the recorder with a little space left on the tape. When the kids were little, she taped them "crying or laughing or saying a funny word." About a day or two before G.M. told her what happened, she wanted to be hugged, kissed and close to her mother; she was acting like a much younger child.

¶ 24    The parties then stipulated that the microcassette recorder contained no discernable voices and had just the sound of a baby crying.

¶ 25    The State's next witness, Maria Salynas, testified that she worked for Resurrection Behavioral Healthcare, in both the financial department and as a Spanish interpreter for Thomas Plach.[2] Plach is a licensed clinical social worker and the director of the Proviso Child Advocacy Center, which is also part of Resurrection Behavioral Healthcare. Marina Acevedo is a case manager at Resurrection. Resurrection had provided Salynas with formal training to act as an interpreter and, prior to December 2007, she had translated over 100 interviews. Typically, she meets the parents and the child in a playroom, and then Plach would introduce her. She would then play with the child for a few minutes and ask basic questions, such as the child's age and school, to make sure that the child is not afraid to talk to her. At some point, Plach asks the child to accompany him and Salynas into a separate room, which has a two-way mirror, allowing others to observe the interview without being

---

[2]In the record, Mr. Plach's name is misspelled as "Mr. Black."

-6-

observed.

¶ 26    Salynas testified that, on December 3, 2007, she translated an interview between Plach and G.M. in the interview room, which was observed by police officers on the other side of the two-way mirror. The three of them sat down at the child-size table in the room, and Plach asked the questions while she translated his questions exactly. At first, Plach asked neutral questions to start the child talking, such as when was the child's birthday and was there cake. He also asked her where she lived and how she traveled to the interview. G.M. stated that she lived with her mother, her brothers and her sister, and that the police had transported her to the interview.

¶ 27    Salynas testified that Plach then asked the eight-year-old G.M. a series of questions designed to determine whether G.M. understood the difference between the truth and a lie. For example, he showed her a picture of two children sitting in a room with a cat, and told her that one child says it is a cat and one says it is a fire engine. Then Plach asked which child was telling the truth. G.M. was able to understand the difference between the truth and a lie.

¶ 28    Salynas testified that, at some point, Plach asked G.M. if someone has done something bad to her, and she said yes. G.M.'s initial response was silence, and she looked around, as though she was afraid of talking. Plach asked her if police had come to her house, and she said yes and that her mom had called them. When the police arrived, she had to go outside. Plach asked her a second time if someone had hurt her, and this time she said yes. Plach asked her if she would like to draw some pictures, and she said yes. G.M. drew a box, which she identified as a bed, and drew herself lying on the bed and also standing beside it. After G.M. drew the picture, Plach asked her again if she was hurt, and G.M. said yes and pointed between the legs of the figure lying on the bed. She said it happened at her home, and the person who had hurt her was a big boy. She finally stated that it was an adult named "Jaime."

¶ 29    Salynas testified that G.M. was then asked to retrieve two anatomically correct girl and boy cloth dolls from a cabinet. G.M. placed the girl on the center of the table and the boy doll on the side. When asked, G.M. was able to correctly identify body parts on the dressed dolls, such as eyes and ears, and to identify their function. She correctly answered that the pants were "up." Then she was able to remove the clothes and to identify correctly when the pants were "down." G.M. stated that, when she was hurt, her pants were down. When Salynas was asked about G.M.'s use of the word "cola" at trial, she testified as follows:

"ASSISTANT STATE'S ATTORNEY [ASA]: Did you converse with her and communicate with her in Spanish?

SALYNAS: Yes.

ASA: Did she have a specific word that she referred to as 'cola'?

SALYNAS: Yes.

ASA: What did she point out when she said that?

SALYNAS: In the back of the doll."

Salynas was also asked about G.M.'s use of the Spanish word "nalgas," and she testified as follows:

"ASA: Did ever [*sic*] she ever use nalgas?

SALYNAS: Yes.

ASA: What did she use that word to describe?

SALYNAS: The back.

ASA: The back or the butt?

SALYNAS: The back or the butt."

G.M. stated that she was hurt in both the front and the back. When asked what Jaime did, G.M. thrust her own hips back and forth, and she said it hurt.

¶ 30    Salynas testified that G.M. said that she was hurt by the "poya" or penis, and she correctly identified the penis on the male doll. G.M. also stated that Jaime licked her on the front. At some point, when Jaime was thrusting, she felt something "yucky" come out. G.M. said that Jaime asked her to use her mouth but she did not. These acts occurred in the living room, and her mom had left the house to buy milk. Jaime hurt her twice, and no one else had hurt her. There was no arguing in the house and no one was hit. The entire interview lasted approximately an hour.

¶ 31    On cross-examination, Salynas testified that G.M. said that her father was at her birthday party. Also, the first time G.M. was asked if she felt anything come out of the boy's penis, she said no; then she was asked again, and she changed her answer.

¶ 32    The State's final witness, Carlos Palomar, testified that he had been a police officer with the Cicero police department since 1999 and that he was now assigned to the patrol division, but back in 2007 he had been assigned to the detective bureau. Palomar speaks both English and Spanish, and he testified at trial primarily about several statements that he obtained from defendant, both orally and later typed out by Palomar and signed by defendant. We describe the statements in detail below to show their consistency over time.

¶ 33    Palomar testified that, on December 2, 2007, he was assigned to investigate G.M.'s case with his partner, Detective Matthew Ramirez, who did not speak Spanish. When they arrived at G.M.'s home, the responding officer, Officer Calderon, briefed them about the incident. Calderon took defendant into custody and transported him to the police station, where Palomar questioned him in Spanish in an interview room. Defendant did not speak English. Palomar first spoke to defendant at 1:09 a.m. on December 3, while defendant was handcuffed and Palomar's partner was also present.

¶ 34    Palomar testified that he explained the nature of the investigation to defendant and presented him with a preprinted *Miranda*-rights waiver form in Spanish which defendant signed. Defendant stated orally that he lived with A.M. and her four children. Two of the children were also his. On "the night in question," two of the children, G.M. and Y.M., were left in his care, when his girlfriend left to collect some money that was owed to her. Defendant and the two children were on a mattress in the living room watching *Rambo* on television. The children started dozing off, so he switched off the set and tried to go to sleep, but he could not fall asleep. G.M. was in the middle, with Y.M. on one side and defendant on the other. Defendant turned toward G.M., removed her underpants and started to lick her anus. He then became erect and inserted his penis into her anus. Once he felt he was going

to climax, he deposited his sperm on her buttocks and on the mattress.

¶ 35    Palomar testified that defendant stated that, the next night, A.M. went to a counseling session and he was again left with the care of those two children and "the same thing" occurred. Again they fell asleep at about 8 p.m. and he did not. Again he removed G.M.'s underpants and licked her anus.

¶ 36    Palomar explained that he did not interview G.M. because the interview of a child, which is called a "VSI" or "Victim Sensitive Interview," had to be handled by a licensed clinical social worker. Palmomar scheduled a VSI for G.M., and typed out defendant's oral statement in Spanish. After typing out the statement, he presented the typed statement to defendant who read it out loud in front of Palomar. Although Palomar informed defendant that he could make corrections, he did not do so. Defendant's typewritten statement was introduced as an exhibit and Palomar translated it for the jury.

¶ 37    The typed statement was substantially the same as the oral statement about which Palomar had already testified, except that it related the following additional information. In the typed statement, which was dated December 3, 2007, defendant stated that the first incident occurred "three weeks prior on a Wednesday." A.M. left at 5 p.m. and was gone until 11 p.m. He inserted his penis in G.M. for two minutes and, after he ejaculated on her buttocks, he retrieved a rose-colored robe from the bathroom and used it to wipe up the semen from G.M. and the mattress. G.M. never woke up, moved or made a noise during this whole time. With respect to the second incident, A.M. left for her counseling session at 7 p.m. During this second incident, he put his tongue in G.M.'s anus, licking it twice, and then he fell asleep. He stated that he believed that "his actions were caused by the devil getting inside" him and that he needed psychological help. These two incidents were the only incidents of inappropriate behavior toward G.M. and he did not sexually abuse any of the other children in the household.

¶ 38    Palomar testified that, later on December 3, 2007, he transported G.M. and her mother to the victim sensitive interview because they lacked transportation, and he observed the interview in an adjacent room through a two-way mirror. On December 4, 2007, Palomar spoke again with defendant for about an hour at the Cicero police station, in the presence of Detective Ramirez, Assistant State's Attorney George Samuel, and Detective Corina Flores. Detective Flores, who is bilingual, presented defendant with a preprinted *Miranda*-rights waiver form in Spanish, which he signed. Palomar again typed up defendant's statement in Spanish and presented it to defendant so that he could review it and make any necessary corrections. Defendant did not make any corrections and signed this second typed statement.

¶ 39    Palomar then translated defendant's second typed statement into English for the jury, as follows in relevant part:

>    "[Defendant] was presented a Polaroid photo of victim [G.M.] And that he identified that as the daughter of his girlfriend [A.M.], and again, indicated by putting his initials on the photo. [Defendant] then related that he lives with his girlfriend [A.M.] and two children from a prior relationship named [G.M.] and [M.M.] He also related that he has two children with her named [J.M.] and [Y.M.], and everybody lives together on the second floor of [address].

-9-

[Defendant] then related, [a]bout three weeks ago on a Wednesday, he was left in the care of the victim [G.M.] and his six-month-old son [Y.M.] while his girlfriend went to run an errand over some money that was owed.

[Defendant] then related that [A.M.] left about 5:00 p.m. in the afternoon, and she was gone until about 11:00 p.m. Defendant then related that around 8:00 p.m. in the afternoon, he says that [Y.M.] and [G.M.], they were on a mattress in the living room and they were watching TV. He recalls it being the movie *Rambo*. [Defendant] then related that he was closer to the door. [G.M.] was in the middle, and [Y.M.] was near the window. [Defendant] then turned off the television and then began to fall asleep with the kids. Then [defendant] [*sic*] then said, I couldn't fall asleep at this moment. [Defendant] related that he got closer to [G.M.] and pulled down her pants and her underpants and began to lick the anus of [G.M.]

[Defendant] then related that he began to become erect and inserted his penis in the anus of [G.M.] [Defendant] then related that this lasted about 2 minutes. [Defendant] then related that as he felt the sensation of climaxing, he removed his penis from [G.M.'s] anus and then deposited his sperm on his [*sic*] buttocks and then again on the mattress. [Defendant] then related that [G.M.] never woke up, and she never moved and she never made a noise.

[Defendant] then related that later he grabbed a robe of his girlfriend's [*sic*] rose colored, and then began to wipe the sperm from her buttocks, from the buttocks of [G.M.].

[Defendant] was then questioned about the second incident. [Defendant] related that it was the following night. He related that his girlfriend [A.M.] had *** left him in the care of [G.M.] and his son [Y.M.] [Defendant] also related that his girlfriend had gone to a therapy session, somewhere in the area of Cermack and 54th Avenue, and he recalls the time being around 7:00 p.m. [Defendant] then related that he along with [G.M.] and [Y.M.] went to sleep around 8:00 p.m. on the same couch on the floor of that room. [Defendant] then related he lowered the pants and the underpants of [G.M.] and placed his tongue in the anus of [G.M.], licking her twice. [Defendant] then related that he lifted up the pants and her underpants and fell asleep."

¶ 40     On cross-examination, Palomar testified that, after he arrived at the house on December 2, 2007, the victim's mother was instructed to take the victim to the hospital but he does not know whether she did. Palomar did not call the paramedics or take any pieces of clothing from the house, since the victim's mother had told them the incident had occurred a week earlier and she informed them that she had done the laundry since then. After defendant told him that he had cleaned up his sperm with his girlfriend's bathrobe, he asked about the robe and A.M. told him that she had already washed it. However, he did not look at the mattress, he did not ascertain whether the mattress was covered by a sheet, and no evidence technicians came to look at the mattress.

¶ 41     Palomar further testified on cross that he typed out A.M.'s statement but he did not show it to her because he had typed it out in English. His report indicated that A.M. told him that she woke up at 5 a.m. on December 2, 2007, and she woke defendant at 5:30 a.m.

¶ 42     After hearing closing arguments and jury instructions, the jury found defendant guilty on all three counts of predatory criminal sexual assault against G.M. At the sentencing hearing on April 11, 2011, after hearing factors in mitigation and aggravation, the trial court sentenced defendant to 3 consecutive 6-year sentences for a total of 18 years with IDOC. Defendant filed a timely notice of appeal on April 11, 2011, and this appeal followed.

¶ 43                                    ANALYSIS

¶ 44     On this direct appeal, defendant claims: (1) that the trial court erred by failing to instruct the jury with IPI Criminal 4th No. 11.66, which is required whenever a trial court admits into evidence a child's sexual-assault outcry statements pursuant to section 115-10 of the Code of Criminal Procedure of 1963 as an exception to the hearsay rule (725 ILCS 5/115-10(c) (West 2006)); and (2) that he is entitled to an additional day of credit for time served, which the State concedes. For the following reasons, we affirm defendant's conviction but order the mittimus corrected to reflect an additional day of credit for time served.

¶ 45                         I. The Hearsay Exception

¶ 46     Section 115-10 of the Code of Criminal Procedure of 1963 permits the State to introduce "[i]n a prosecution for a physical act or sexual act perpetuated upon or against a child under the age of 13" the following testimony:

> "testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS 5/115-10(a)(2) (West 2006).

¶ 47     This testimony may be admitted into evidence only if (1) "[t]he court finds in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient safeguards of reliability"; (2) the child testifies at the proceeding, or the child is unavailable and there is other corroborating evidence; and (3) the statement was made either before the victim turned 13 years of age or within three months of the offense. 725 ILCS 5/115-10(b) (West 2006). In the case at bar, (1) the trial court held a hearing; (2) the child testified at the proceeding; and (3) the statement was made before the victim turned 13 years of age.

¶ 48                     II. The Required Jury Instruction

¶ 49     Section 115-10 further provides that, if the trial court admits a hearsay statement pursuant to this exception, the trial court must specifically instruct the jury that:

> "it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." 725 ILCS 5/115-10(c) (West 2006).

¶ 50     IPI Criminal 4th No. 11.66 was designed to implement the above statutory requirement, and it states:

"You have before you evidence that _____ made statements concerning the offenses charged in this case. It is for you to determine whether the statements were made, and, if so, what weight should be given to the statements. In making that determination, you should consider the age and maturity of _____, the nature of the statements, and the circumstances under which the statements were made."

As stated above, there is no dispute that this instruction was required in this case, that it was not given, and that the defense counsel failed to ask for it. See *Sargent*, 239 Ill. 2d at 190 ("there is no dispute that the jury should have been instructed in accordance with section 115-10(c)").

¶ 51                    III. Rules Governing Review of Instructions

¶ 52        Supreme Court Rules 366(b)(2)(i) and 451(c) govern the appellate review of jury instructions in Illinois. Ill. S. Ct. R. 366(b)(2)(i) (eff. Feb. 1, 1994), R. 451(c) (eff. July 1, 2006). Supreme Court Rule 366(b)(2) provides: "No party may raise on appeal the failure to give an instruction unless the party shall have tendered it." Ill. S. Ct. R. 366(b)(2)(i) (eff. Feb. 1, 1994). In addition, the Illinois Supreme Court has held, specifically with respect to jury instructions, that "a defendant forfeits review of any supposed jury instruction error if he [(1)] does not object to the instruction or offer an alternative at trial and [(2)] does not raise the issue in a posttrial motion." *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 175 (2005)); see also *Sargent*, 239 Ill. 2d at 188-89.

¶ 53        However, Supreme Court Rule 451(c) softens the otherwise harsh forfeiture effect of Supreme Court Rule 366(b)(2)(i) by permitting some limited review, even when a defendant has failed to raise the instruction error at trial or in a posttrial motion. *Piatkowski*, 225 Ill. 2d at 564 (Rule 451(c) permits some "limited" review, despite a party's forfeiture). Specifically, Rule 451(c) states that "substantial defects" in criminal jury instructions "are not waived by [a party's] failure to make timely objections *** if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. July 1, 2006).

¶ 54        The Illinois Supreme Court has explained that the purpose behind Rule 451(c) is to permit a reviewing court to correct (1) "grave errors" and (2) "errors in cases so factually close that fundamental fairness requires that the jury be properly instructed." *Sargent*, 239 Ill. 2d at 189. See also *Piatkowski*, 225 Ill. 2d at 564; *Herron*, 215 Ill. 2d at 175. The supreme court has also held that Rule 451(c) is "coextensive" with the plain error rule, and that "the two rules are construed identically." *Piatkowski*, 225 Ill. 2d at 564. See also *Sargent*, 239 Ill. 2d at 189, *Herron*, 215 Ill. 2d at 175.

¶ 55                            IV. Plain Error Rule

¶ 56        Defendant argues that the trial court committed plain error when it failed to give the required instruction or, in the alternative, that his trial counsel was ineffective for failing to tender it. We will discuss plain error first.

¶ 57        The plain error rule permits a reviewing court to consider an unpreserved error when: "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error

alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. See also *Sargent*, 239 Ill. 2d at 189; *Herron*, 215 Ill. 2d at 186-87.

¶ 58    The first step in applying the plain error rule is to determine whether "a clear and obvious error" occurred. *Sargent*, 239 Ill. 2d at 189-90. See also *Piatkowski*, 225 Ill. 2d at 565; *Herron*, 215 Ill. 2d at 191. If there was no clear and obvious error, then neither prong of the test can be satisfied. *Sargent*, 239 Ill. 2d at 189-90. Defendant bears the burden of persuasion in showing both that a clear and obvious error exists and that one of the prongs is satisfied. *Sargent*, 239 Ill. 2d at 190; *Piatkowski*, 225 Ill. 2d at 566 ("defendant must meet his burden"); *Herron*, 215 Ill. 2d at 186-87 ("defendant must show both").

¶ 59    Our task in determining "clear and obvious error" has been simplified by the fact that the supreme court has already held that the failure to give the instruction as required by section 115-10(c) of the Code of Criminal Procedure of 1963 is "a clear and obvious error." *Sargent*, 239 Ill. 2d at 190. There is no dispute on appeal that the instruction was required and that it was not given, so we proceed to analyze the individual prongs of the plain error rule.

¶ 60    Defendant states in his reply brief to this court that he does "not argue that this error qualified for review as second-prong plain error." Thus, per his request, we will review the error only under the first, or "closely balanced," prong, of the plain error rule.

¶ 61                    V. The Meaning of "Closely Balanced"

¶ 62    Before we can determine whether the evidence at trial was closely balanced, we must first determine what evidence we may place on the scales to determine whether they were closely balanced. The question is whether we may place on the scales the very hearsay statements that were at issue in the jury instruction.

¶ 63    Defendant argues that we may not. In his brief to this court, defendant argues that the evidence on the mouth-to-anus counts was closely balanced because on the prosecution side of the scale is the fact that defendant confessed in a statement to police that he licked the victim's anus, but on the other side of the scale are the facts that the victim testified at trial that defendant licked only her vagina, not her anus, and that there was no physical evidence. Defendant thus argues that it was the hearsay outcry statement that tipped the scales against him, and caused the jury to convict him on the two mouth-to-anus counts.

¶ 64    In contrast to defendant, the State asks us to consider the hearsay outcry statements on the prosecution side of the scale, arguing that this outcry corroboration was part of the evidence that made the State's case against defendant overwhelming. *People v. Lara*, 2012 IL 112370, ¶¶ 17-18, 32, 36, 39 (corroboration of a defendant's confession does not require direct corroboration, such as a victim's testimony or physical evidence, but may be shown by circumstances tending to establish the crime and the defendant's identity as the perpetrator).

¶ 65    In *Sargent*, the supreme court did consider the hearsay outcry statements on the prosecution side of the scale. We know that the court placed them there because the court

stated: "[d]efendant's confession and the statements made by J.W. and M.G., when taken together, overwhelmingly established defendant's guilt." *Sargent*, 239 Ill. 2d at 190. Although J.W. testified at trial about the abuse, M.G. testified that he did not remember it. *Sargent*, 239 Ill. 2d at 171, 174. Thus the only statements by M.G. that the supreme court could have been referring to were his hearsay outcry statements. Although the *Sargent* court considered the hearsay outcry statements when weighing the prosecution's case, whether or not they should have been so weighed was apparently not an issue before the court. The court's opinion contains no analysis of the issue and no holding concerning it. The only way we know that the statements were even included on the prosecution side of the scale is the simple placement of the initials "M.G." before the word "statements" in the court's conclusion.

¶ 66       Although the *Sargent* court considered the hearsay outcry statements when weighing the prosecution's case, whether or not they should have been so weighed was apparently not an issue before the court. The court's opinion contains no analysis of the issue and no holding concerning it. The only way we know that the statements were even included on the prosecution side of the scale is the simple placement of the initials "M.G." before the word "statements" in the court's conclusion.

¶ 67       This issue was apparently not before the *Sargent* court and, as we previously observed, there is no published opinion discussing this holding in *Sargent*. Thus, this is an issue of first impression. We consider below the effect of the jury instruction error and how it affected the scales of justice in this case.

¶ 68       When we evaluate the effect of a jury instruction error, we consider the jury instructions "as a whole," rather than considering the error "in isolation." *People v. Parker*, 223 Ill. 2d 494, 501 (2006). The question for us is "whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Parker*, 223 Ill. 2d at 501. We will find the instructions sufficient, if as a whole, the series of instructions fully and fairly provided the applicable law. *Parker*, 223 Ill. 2d at 501. The erroneous omission of any one jury instruction "rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted defendant because they did not understand the applicable law." *Sargent*, 239 Ill. 2d at 191.

¶ 69       In *Sargent*, when the supreme court rejected the defendant's second-prong argument, the court observed that "the jury in this case was not left without direction regarding how it was to approach the victim's statements," because the jury had received an instruction based on IPI Criminal 4th No. 1.02. *Sargent*, 239 Ill. 2d at 192. In the case at bar, the trial court also provided an instruction based on Illinois Pattern Jury Instructions, Criminal, No. 1.02 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 1.02), which stated:

> "Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his age, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

The above instruction does differ from the missing instruction. For example, although the

-14-

above instruction allows the jury to consider a witness's "age," it does not direct the jury to also consider the witness's "maturity," like the missing instruction does.

¶ 70    The *Sargent* court found that, although "the language in [IPI Criminal 4th No. 1.02 and IPI Criminal 4th No. 11.66] differs, they convey similar principles regarding the jury's role in assessing witness credibility and the various criteria jurors may consider when making that assessment." *Sargent*, 239 Ill. 2d at 192. The *Sargent* court appeared to hold, in effect, that when deciding whether the evidence was closely balanced for purposes of plain error review, a reviewing court may place the hearsay outcry statements on the prosecution's side of the scale, if the trial court had cautioned the jury about a witness's "age" in an instruction based on IPI Criminal 4th No. 1.02, although it had erroneously omitted IPI Criminal 4th No. 11.66.

¶ 71    As our supreme court also stated, "we do not mean to suggest that [trial] courts have the discretion" to exchange one instruction for another; rather, we conclude only that we may consider the hearsay outcry statements on the prosecution's side of the scale as we determine whether the evidence was closely balanced for purposes of plain error review and whether the omitted instruction was the error that tipped the scales of justice against defendant, in light of the fact that a similar, though not identical, instruction was given. *Sargent*, 239 Ill. 2d at 194.

¶ 72                               VI. Not Closely Balanced

¶ 73    For the reasons discussed below, we do not find persuasive defendant's argument that the evidence was closely balanced on the two mouth-to-anus counts. First, defendant's sexual assaults on G.M., in general, were proven by: (1) G.M.'s testimony at trial; (2) her hearsay outcry statements to both her mother and a social worker, as translated by a Spanish interpreter; (3) defendant's admission to A.M.; and (4) defendant's subsequent statement to the police. Specifically, with respect to mouth-to-anus contact, although the victim testified at trial that defendant licked her vagina but not her anus, defendant admitted both to the police and to A.M. that he licked G.M.'s anus. Our conclusion is similar to that of the supreme court in *Sargent*, where the court found that the defendant's confession concerning M.G., plus M.G.'s hearsay outcry statement, created "overwhelming[ ]" evidence of the defendant's guilt with respect to M.G., even though M.G. at trial testified that he could not remember. *Sargent*, 239 Ill. 2d at 171, 190. As the supreme court did in *Sargent*, we conclude that the evidence was not closely balanced, and thus the error, although clear and obvious, did not rise to the level of plain error.

¶ 74                            VII. Not Ineffective Assistance

¶ 75    Defendant argues, in the alternative, that his trial counsel was ineffective for failing to tender the required jury instruction. For the reasons explained below, we conclude that the error did not create the substantial prejudice required for an ineffectiveness claim to succeed. It will be the rare case indeed where a court finds that the evidence was not closely balanced in a plain error analysis, but then proceeds to find that the same error created the substantial prejudice required for an ineffectiveness claim.

¶ 76    Illinois courts evaluate a claim of ineffective assistance of counsel under the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11 (citing *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010), and *People v. Albanese*, 104 Ill. 2d 504, 526 (1984)). Under this test, a defendant must show both: (1) that his or her counsel's performance was deficient; and (2) that defendant suffered substantial prejudice as a result of this deficient performance. *People v. Sutherland*, 2013 IL App (1st) 113072, ¶ 20; *People v. Denson*, 2013 IL App (2d) 110652, ¶ 31. To establish a deficient performance, defendant must show that "counsel's performance fell below an objective standard of reasonableness"; and to establish substantial prejudice, defendant must demonstrate that "a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Henderson*, 2013 IL 114040, ¶ 11.

¶ 77    Since a failure to establish either prong of the *Strickland* test will doom an ineffectiveness claim, we may evaluate the second prong first. *Henderson*, 2013 IL 114040, ¶ 11; *Sutherland*, 2013 IL App (1st) 113072, ¶ 20 (a defendant must "satisfy both prongs of the *Strickland* test"). "A lack of substantial prejudice is fatal to a claim of ineffective assistance." *Denson*, 2013 IL App (2d) 110652, ¶ 31.

¶ 78    In the case at bar, defendant did not suffer substantial prejudice from his trial counsel's failure to request the required jury instruction where, as we explained above, the evidence against him was overwhelming. In addition, the evidence of mouth-to-anus contact, which consisted of defendant's own admissions to A.M. and to the police, was not affected by the trial court's failure to provide the required instruction. *Lara*, 2012 IL 112370, ¶ 33 (direct corroboration of a defendant's confession on the element of penetration or contact is not necessary under the *corpus delecti* rule). A.M. testified that defendant admitted to her, before she called the police, that he had licked G.M.'s "nalgas," or rear; and defendant, in his statement to the police, later confirmed that he licked G.M.'s anus. In his reply brief to this court, defendant claims that both A.M. and "Salynas reported that G.M. had told them that [defendant] licked her anus," and cites portions of the record in support. However, the cited portions of the record do not indicate that defendant licked G.M.'s anus.

¶ 79    As a result, the specific evidence of mouth-to-anus contact was not affected by the failure to provide the required instruction. As a result, defendant did not satisfy his burden to show that "a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Henderson*, 2013 IL 114040, ¶ 11. Thus, we conclude that the ineffectiveness claim was no more persuasive than the claim of plain error.

¶ 80                                        CONCLUSION

¶ 81    For the foregoing reasons, we affirm defendant's conviction but order the mittimus corrected to reflect an additional day of credit for time served.

¶ 82    Affirmed; mittimus corrected.