# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *People v. Moon*, 2020 IL App (1st) 170675

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OMEGA MOON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-0675 |
| Filed | March 20, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-DV-74336; the Hon. Caroline Kate Moreland, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Eric E. Castañeda, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Douglas P. Harvath, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Mikva concurred in the judgment and opinion.<br>Justice Connors dissented, with opinion. |

**OPINION**

¶ 1    Following a 2016 jury trial, defendant Omega Moon was convicted of domestic battery and sentenced to one year of probation. On appeal, defendant contends that (1) her conviction is a nullity because the jury was not properly sworn before trial, (2) the trial court erred by not asking potential jurors all the *voir dire* questions required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and (3) the court did not give a jury instruction required by statute. For the reasons stated below, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3    On October 24, 2016, a jury found defendant guilty of domestic battery. On March 7, 2017, the court sentenced defendant to one year of probation with fines and fees. Defendant filed her notice of appeal on March 13, 2017. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. July 1, 2017) governing appeals from a final judgment of conviction in a criminal case.

¶ 4                                    II. BACKGROUND

¶ 5    Defendant was charged with domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2014)) for allegedly, on or about June 22, 2014, "knowing and intentionally caus[ing] bodily harm to" family member Shontrell Moon by striking him "several times with [an] object," leaving belt-buckle-shaped marks on his left arm and "causing redness, swelling and broken skin."

¶ 6                        A. Pretrial and Commencement of Trial

¶ 7    The public defender of Cook County was appointed to represent defendant.

¶ 8    The State filed a motion to admit as evidence "under the hearsay exception delineated in 725 ILCS 5/115-10" statements made by then-eight-year-old Shontrell to named persons, including a police officer and an employee of the Department of Children and Family Services (Department). Following hearing testimony by the officer and Department employee, the court found their testimony to Shontrell's statements to be admissible.

¶ 9    Before *voir dire*, the court made various remarks to the venire. The court said that it would "discuss some principles of law" but this would not be "your final or formal instructions on the law." The court told the venire that the domestic battery charge against defendant was not evidence and the venire could draw no inference of guilt from it. The court asked if everyone understood and noted that everyone nodded. The court told the venire that defendant is presumed innocent of the charge unless and until the jury is convinced of her guilt beyond a reasonable doubt. The court asked if everyone understood and accepted this principle, asked the venire to raise a hand if anyone did not, and noted that nobody did. The court told the venire that the State bears the burden of proving defendant guilty beyond a reasonable doubt. The court asked if everyone understood and accepted this principle, asked the venire to raise a hand if anyone did not understand and accept the principle, and noted that nobody raised a hand. The court told the venire that defendant is not required to prove her innocence and need not present any witnesses. The court asked if anyone disagreed with this principle, asked the venire to raise a hand if anyone did, and noted that nobody did. The court then asked if everyone

understood and accepted this principle, asked the venire to raise a hand if anyone did not, and noted that nobody did. The court told the venire that defendant does not have to testify, asked the venire if anyone would hold that principle against her, asked the venire to raise a hand if anyone would, and noted that nobody did. Neither party objected during the court's remarks and questions.

¶ 10 During *voir dire*, the court asked each potential juror, in relevant part, if he or she would decide this case without sympathy, bias, or prejudice to either side; if he or she would wait for all the evidence, arguments, and instructions before making up his or her mind; if he or she would follow the law as given by the court; and if he or she would be fair to both sides.

¶ 11 After 12 jurors and an alternate juror were chosen, the court asked for the jury to be sworn, and the record indicates "(Jury sworn to answer questions.)."

¶ 12 B. Trial Evidence

¶ 13 Shontrell Moon testified that he was 11 years old as of the 2016 trial, had lived with defendant as of June 2014 for about 8 years, and referred to defendant then as his "mom." On June 22, he visited his mother Angel for a few hours with defendant's permission. Angel picked him up by car, and he went home by bicycle when defendant came to Angel's home to tell him to come home. It was still daytime when he arrived home. Defendant then "whipped me with a belt buckle" multiple times on his bare back and arm when nobody else was in the room. "A little bit later," a police officer came to the home, and Shontrell spoke with her on the porch "about what had happened." That night, he went to a hospital, where he spoke "about what had happened" with a Department employee named Karen. Shontrell had belt buckle marks on his arm and back.

¶ 14 On cross-examination, Shontrell testified that he asked defendant's permission to go to Angel's home when Angel arrived at his home and that defendant gave permission. He could not recall what time that happened. When asked if he knew that defendant did not allow him to go to Angel's house, Shontrell replied that she gave him such permission, although not often, and denied that the occasion at issue was the first time he asked for permission to go to Angel's home. When asked if two officers came to his home, he maintained that "[t]here was one," the officer who spoke with him on the porch. The officer asked where he had been "because they were looking for you." He denied telling the officer that he was home the entire time and denied that he was afraid to admit being at Angel's home. He also denied telling Karen at the hospital that defendant's son was in the room when defendant struck him with the belt buckle. However, he acknowledged telling Karen that defendant "doesn't hit" him and that he is not afraid of her. After the night in question, Shontrell lived with defendant for another two months.

¶ 15 On redirect examination, Shontrell clarified that he told Karen that defendant struck him with a belt on the day in question but had not struck him before that day.

¶ 16 Police officer Kimberly Nelson testified that she and another officer went to defendant's home at about 7:30 p.m. on June 22, 2014, in response to a report of a missing child. There, she spoke with defendant, who said that her son Shontrell was missing. When asked why she thought so, defendant said that "some neighborhood kid told her that the child's stepmother came, put his bike in her car, and took him away in the car." Defendant and Nelson unsuccessfully searched the neighborhood together until defendant spoke with someone by telephone and then said that Shontrell was at home. Nelson and defendant returned home, where defendant stayed in the police car while Nelson spoke with Shontrell. He was shirtless

- 3 -

and had a bruise on his arm. When Nelson asked how he came to be bruised, he answered that "he got a whipping" from "his momma" with a belt buckle. When Nelson was asked at trial if Shontrell had clarified who he meant, she testified that he said that "Momma Moon"—that is, defendant—whipped him.

¶ 17 Officer Nelson then went to ask defendant how Shontrell came to be bruised. She initially replied by asking Nelson the same question, before claiming that Shontrell fell while playing basketball the previous day. After conferring with her partner, Nelson decided to arrest defendant. She took her to the police station and summoned an ambulance for Shontrell to take him to a hospital. At trial, Nelson identified various photographs as depicting the buckle-shaped bruises she saw that day on Shontrell's left arm.

¶ 18 On cross-examination, Officer Nelson testified that her search for Shontrell included going to Angel's house, where someone told her that Angel was not home. However, Nelson's report reflected that Angel answered certain questions from Nelson, including admitting that she has no visitation rights regarding Shontrell. Nelson then acknowledged that "I guess I did" speak with Angel. When Nelson questioned Shontrell on the porch, she did not ask him when he was whipped. He told her at first that he went to Angel's home but then said that he had been home "the whole time." Nelson did not "know what his time frame was" for that remark.

¶ 19 Karen Dixon testified to being a child abuse investigator for the Department. She interviewed Shontrell at the hospital on June 22, 2014. He told her that he was out riding his bicycle when Angel approached him and took him to her home, where he stayed until defendant came to Angel's home and told him to come home. (Dixon explained that Angel, actually named Tara Sahara, is Shontrell's natural mother and defendant was his guardian.) By his account, he returned home by bicycle, where defendant whipped him with a belt in the presence of her son. Shontrell told her that he was not afraid of defendant and that she did not strike him often. Dixon saw "belt marks on his arm and his back" after he removed his shirt. At trial, Dixon identified various photographs as depicting the multiple buckle-shaped bruises she saw that day on Shontrell's back and arm. Shontrell told Dixon that day that he received those injuries from a whipping by defendant. On June 25, Dixon spoke with defendant. She told Dixon that she searched for Shontrell on the day in question until she found him and sent him home, where she whipped him with a belt. Defendant did not tell Dixon that anyone else had harmed Shontrell.

¶ 20 On cross-examination, Dixon testified that Shontrell never told her that he asked defendant for permission to visit Angel. While Dixon's meeting notes indicated that Shontrell said "he is not hit by" defendant, she explained that he said that defendant did not routinely discipline him by hitting him. When defendant was released from police custody, Shontrell was returned to her home. Dixon's notes of her June 25 meeting with defendant, including that defendant admitted whipping Shontrell, were not prepared until mid-August.

¶ 21 On redirect examination, Dixon testified that she documented her investigation, including the meeting notes with defendant, once her investigation was complete. Shontrell did not tell Dixon that defendant did not strike him on June 22, nor that someone else struck him that day. However, on recross-examination, Dixon testified that Shontrell acknowledged being with other adults than defendant on the day in question.

¶ 22 The defense moved for a directed verdict, which the court denied following arguments. The jury instruction conference was then held, during which the defense made no objections. Defendant personally elected not to testify, after conferring with counsel, and the instructions

were adjusted accordingly. Neither party sought a jury instruction pursuant to Illinois Pattern Jury Instructions, Criminal, No. 11.66 (approved July 18, 2014) (hereinafter IPI Criminal No. 11.66).

¶ 23    Ariel Gray, defendant's daughter, testified that she was visiting defendant's home at about 1 p.m. on June 22, 2014, when Shontrell and defendant's son went outside to play. After about an hour, defendant left to search for Shontrell, as he was no longer outside her home. Her search was unsuccessful, but Shontrell returned home a few hours later. He did not appear injured but was "a little worried and unsettled." He told Gray that he had been at Angel's home, and Gray phoned defendant to inform her that Shontrell was home. Defendant did not reenter the home. Gray was in a back room when the police arrived, so she did not see them. On cross-examination, Gray testified that she did not see Shontrell shirtless that day and thus did not see his back or upper left arm.

¶ 24    Tara Sahara testified that she is Shontrell's natural mother and is also known as Angel. She denied hitting Shontrell on the day in question and denied ever striking him with a belt. While Shontrell was at her home that day, Sahara denied picking him up at defendant's home and presumed he arrived by bicycle. She was not home when he was at her home, so she did not see him on the day in question.

¶ 25                                    C. Instructions, Deliberations, and Posttrial

¶ 26    The jury was given instruction, including the pattern instruction on general witness credibility (Illinois Pattern Jury Instructions, Criminal, No. 1.02 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 1.02)) but not IPI Criminal No. 11.66.

¶ 27    Following closing arguments, the jury found defendant guilty of domestic battery.

¶ 28    Defendant filed a posttrial motion claiming, in relevant part, insufficiency of the evidence and that the "jury was not sworn to try the issues." The posttrial motion raised no claims regarding *voir dire* or jury instructions. Regarding the jury, defendant alleged that the clerk of the court administered the *voir dire* oath, rather than the trial oath, after jury selection.

¶ 29    Attached to the posttrial motion were affidavits by two assistant public defenders averring to being in court during defendant's trial. After jury selection,

> "the Clerk of Court asked the jurors to swear or affirm that they would truthfully answer all questions asked concerning their qualifications to sit as jurors. *** The Clerk did not administer any oath to the jurors that involved their faithful performance to honestly try the issues joined in the case, without fear, sympathy or prejudice and render a just and fair verdict according to the law and the evidence."

¶ 30    The State responded to the posttrial motion, arguing in relevant part that the evidence was sufficient to convict defendant and that the jury was properly sworn. Regarding the latter, the State noted that the trial transcript did not record the oath verbatim and that defendant made no objection during trial despite two assistant public defenders (while the public defender represented defendant) later averring to hearing the wrong oath administered to the jury. The State argued that "there is a presumption that the correct language was used when the record indicates that an oath was administered."

¶ 31    At the posttrial hearing, the parties stipulated that the jury was administered the *voir dire* oath—"do you solemnly swear or affirm you'll truthfully answer all questions asked concerning your qualifications as jurors in this case"—after jury selection. Following

arguments by the parties, the court denied the motion. Noting that Illinois case law has not determined the effect of a complete trial by an unsworn jury and that several states have found such to be a nullity while other states have found otherwise, the trial court found that a trial by an unsworn jury is not a *per se* error. Thus, a defendant must show prejudice. The court found no prejudice to defendant from the lack of a trial oath, noting that the specific content of the jury's trial oath is not prescribed by statute and that nobody objected when the incorrect oath was given nor thereafter during the trial. The court also noted that the potential jurors were admonished regarding the legal principles governing a criminal case and that all were asked if they could decide the case without prejudice or sympathy and wait for all the evidence, arguments, and instructions before so deciding. Regarding the sufficiency of the evidence, the court noted that there were discrepancies in the testimony but expressly found Shontrell's testimony to be consistent and amply corroborated on the key question of who inflicted belt-buckle-shaped marks upon him.

¶ 32 Following a sentencing hearing, the court sentenced defendant to one year of probation with fines and fees. This appeal timely followed.

¶ 33                                             III. ANALYSIS

¶ 34 On appeal, defendant contends that (1) her conviction is a nullity because the jury was not properly sworn before trial, (2) the trial court erred by not asking potential jurors all the *voir dire* questions required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and (3) the court did not give the IPI Criminal No. 11.66 instruction as required by statute.

¶ 35                                        A. Jurors' Trial Oath

¶ 36 Defendant primarily contends that her conviction is a nullity because the jury was not properly sworn before trial, and she seeks remand for a new trial. While defendant raised this claim in her posttrial motion, she did not object before or during trial to the jury not being administered the trial oath.

¶ 37 Swearing in a criminal trial jury is vital, as it signifies the moment at which jeopardy attaches. *Martinez v. Illinois*, 572 U.S. 833, 840 (2014) (*per curiam*); 720 ILCS 5/3-4(a)(3) (West 2018). However, no Illinois statute or Illinois Supreme Court Rule prescribes the form or language of the criminal trial juror's oath, though statutes prescribe the form of various other jury oaths. See, *e.g.*, 725 ILCS 5/112-2(c) (West 2018) (criminal grand jury); 55 ILCS 5/3-3024 (West 2018) (coroner's jury); 735 ILCS 30/10-5-40 (West 2018) (eminent domain cases).

¶ 38 Of historical interest is *Cornelius v. Boucher*, 1 Ill. 32 (1820), where our supreme court found that an irregularity in swearing a civil jury (the jury was sworn to try only one issue of fact among three while its verdict was not based on that issue) was waived or forfeited by the failure to object at the time. "The swearing the jury, is matter of form, and if not objected to at the time, an irregularity in the manner of swearing them, can not afterwards be assigned as error." *Id.* at 33. Our supreme court similarly held in *McDonald v. Fairbanks, Morse & Co.*, 161 Ill. 124, 131 (1896), that a civil verdict was not void or irregular merely because the trial proceeded to verdict without the jury being fully sworn (the jury was sworn to try the issues but not to assess damages) when "no objection was made, and the attention of the court was not called to the matter in any way."

¶ 39    In *People v. Abadia*, 328 Ill. App. 3d 669, 675-76 (2001), this court considered as a matter "of first impression in Illinois" a claim that two criminal defendants were entitled to a new trial when their jury was not sworn until the second day of trial. There, as here, the exact wording of the jurors' oath was not recorded, and the defendants did not object at trial to the absence of the oath. *Id.* While noting that "the juror's oath is a solemn vow to serve the rule of law which governs the social contract of our society," we found that the issue was "whether the failure to administer the juror's oath until the conclusion of the first day of testimony vitiates the entire proceeding and entitles defendants to a new trial." *Id.* at 676. We answered that question in the negative, noting that the court had instructed the jury on its duties at length before trial commenced. *Id.* at 676-77.

> "The extensive nature of the Judge's pretrial instructions to the jury and the fact that the jury in this case was sworn before they began deliberations obviate our concern that the proceeding was tainted. All the concepts required by our system of justice to be communicated to a juror were effectively imparted in these pretrial instructions. In this case, it is clear from the record that the pretrial instructions preserved the integrity of the proceeding until the juror's oath was administered. While swearing the jury is preferably done prior to opening statements (as all pretrial instructions may not be as thorough as those given in the instant case), the one-day delay in giving the oath did not deprive these defendants of a fair trial." *Id.* at 677.

The *Abadia* court cited various cases from other jurisdictions as persuasive. *Id.* at 677-78 (and cases cited therein). We also stated that "we believe that it is incumbent upon the defense to raise an objection to an unsworn jury at trial or risk waiving the issue on appeal." *Id.* at 678.

¶ 40    Turning to courts outside Illinois, we find a significant split in the case law on unsworn juries. See, *e.g.*, *Adams v. State*, 690 S.E.2d 171, 173 (Ga. 2010) (discussing the stances of various state courts); *Harris v. State*, 956 A.2d 204, 210-11 (Md. 2008) (same). Some courts have held a trial with an unsworn jury is a nullity. *Adams*, 690 S.E.2d at 173-74 (complete trial by unsworn jury is a nullity, but prejudice must be shown when oath given before deliberations); *Barclay v. State*, 39 So. 3d 209, 211 (Ala. Crim. App. 2008) (as verdict by unsworn jury is a nullity, claim of such is jurisdictional). In other words, these courts have found an unsworn jury to be a structural error not subject to forfeiture or harmless error analysis. *Adams*, 690 S.E.2d at 173 (but belated oath is subject to harmless error); *Harris*, 956 A.2d at 211-12; *Barclay*, 39 So. 3d at 211.

¶ 41    However, other courts have held that a jury not given the trial oath is not structural error but an error subject to forfeiture. See, *e.g.*, *People v. Cain*, 869 N.W.2d 829 (Mich. 2015); *State v. Arellano*, 1998-NMSC-026, 125 N.M. 709, 965 P.2d 293. "The oath imposes on the jurors three duties: (1) to justly decide the questions submitted, (2) to render a true verdict, and (3) to do these things only on the evidence introduced and in accordance with the instructions of the court." (Internal quotation marks omitted.) *Cain*, 869 N.W.2d at 836. "Our review of the record in this case reveals that the error of failing to properly swear the jury did not undermine the proceedings with respect to the broader pursuits and values that the oath seeks to advance." *Id.*

> "The failure to provide the correct oath was an error, but not one that would result in manifest injustice if left unremedied here. We do nothing to diminish the value of the juror's oath to say that its absence *in this case* did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. It is but one component—as

important and as symbolic as it may be—in a larger process of fair and impartial adjudication. Because the record before us indicates that defendant was actually ensured a fair and impartial jury, we conclude that his constitutional rights were upheld and reversal is not warranted." (Emphasis in original.) *Id.* at 840.

¶ 42 Here, the jurors were administered the *voir dire* oath rather than the trial oath before trial, and defendant did not bring this to the trial court's attention until her posttrial motion, so that the entire trial was heard by a jury not given the trial oath. We are faced with a clear error of a trial by a jury never sworn to try the case and an equally clear forfeiture of defendant's claim.

¶ 43 However, we need not resolve the effect under Illinois law of a forfeited claim of a trial by an unsworn jury because the jury here was not completely unsworn. It was administered an oath at the trial court's direction after the jury was selected and before opening statements and testimony. While that oath did not mention trying the issues in the case according to the law and evidence, the jurors all solemnly swore to truthfully answer all questions asked, albeit about their qualifications as jurors. We cannot find anything but clear error in the defective wording of that oath. Of the duties imposed by the trial oath as described in *Cain*, the oath sworn by the jury here directed the jurors to properly answer all questions submitted to them but did not direct them to render a true verdict upon only the evidence and instructions presented. However, we also cannot in fairness to all involved in the trial find that this jury was outright or absolutely not administered a solemn oath at the proper and crucial moment between its selection and the commencement of trial. We note that the Michigan Supreme Court in *Cain* faced the same circumstances as here: the jury was given the *voir dire* oath rather than the trial oath just before trial. *Cain*, 869 N.W.2d at 831; see also *Ex parte Benford*, 935 So. 2d 421, 429 (Ala. 2006) (when venire given *voir dire* oath but jurors not given trial oath, oath was defective rather than nonexistent and forfeiture applied).

¶ 44 We may consider a forfeited claim as a matter of plain error: a clear and obvious error that either (1) occurred when the evidence was so closely balanced that the error alone threatened to change the result or (2) was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. We shall therefore conduct a plain error analysis, beginning by reiterating that the error in giving the wrong oath was clear.

¶ 45 We find that the evidence here was not closely balanced. The evidence was clear that Shontrell was whipped with a belt so that the buckle struck his back multiple times. Shontrell testified to being so attacked on the day alleged, Officer Nelson and Department investigator Dixon testified to seeing the buckle-shaped injuries on Shontrell that same day, and photographs of Shontrell's injuries were entered into trial evidence. Shontrell was consistent that defendant was the person who whipped him with a belt buckle, telling Officer Nelson and Dixon so on the day in question as well as testifying so at trial. Moreover, Dixon testified that defendant admitted to whipping Shontrell with a belt. We agree with the trial court that, while there were discrepancies in the testimony, they did not impeach the evidence that defendant battered Shontrell as alleged. Indeed, to the extent that evidence showed that Shontrell went to Sahara's home without defendant's permission, contrary to Shontrell's trial testimony, such evidence tends to show defendant's motive for whipping Shontrell.

¶ 46 Turning to second-prong plain error, we find, as the *Cain* court found, that our

> "review of the record reveals that the jurors were conscious of the gravity of the task before them and the manner in which that task was to be carried out, the two primary

purposes served by the juror's oath. Thus, we cannot say that the error here of failing to properly swear the jury seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Cain*, 869 N.W.2d at 831.

Here, the court asked every potential juror during *voir dire* if he or she would decide this case without sympathy, bias, or prejudice to either side; if he or she would wait for all the evidence, arguments, and instructions before making up his or her mind; if he or she would follow the law as given by the court; and if he or she would be fair to both sides. As in *Cain*, we find that those inquiries, and the court's other instructions and admonishments, sufficiently addressed the purposes of the trial oath to conclude that the clear error did not affect the fairness of the trial or challenge the integrity of the judicial process.[1] Giving the wrong oath was clear error but not plain error under either prong.

¶ 47                                     B. Rule 431(b)

¶ 48    Defendant also contends that the trial court erred by not asking the venire or potential jurors all the *voir dire* questions required by Rule 431(b). In particular, she argues that the court erred by not asking whether the venire both understood and accepted the principle that it cannot be held against a defendant that he or she does not testify.

¶ 49    Defendant forfeited this claim by not raising it in the trial court (see *Sebby*, 2017 IL 119445, ¶ 48) but argues that we may consider it as plain error. As stated above, plain error is a clear and obvious error that either (1) occurred when the evidence was so closely balanced that the error alone threatened to change the result or (2) was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *Id.*

¶ 50    Failure to comply with Rule 431(b) is not second-prong plain error unless the defendant shows that the Rule 431(b) violation actually produced a biased jury. *Id.* ¶ 52. As defendant does not so claim, any plain error here would have to arise from closely balanced evidence. In determining whether evidence was closely balanced, we perform a commonsense and qualitative, rather than strictly quantitative, assessment of the entirety of the trial evidence in context against the elements of the charged offense. *Id.* ¶ 53. Evidence is closely balanced when the State and defense witnesses presented two plausible opposing accounts of events and no extrinsic evidence corroborated or contradicted either version so that the conviction necessarily rested upon a credibility contest. *Id.* ¶¶ 61-63. Conversely, there is no credibility contest, and evidence is not closely balanced, "when one party's version of events is unrefuted, implausible, or corroborated by other evidence." *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 48. "[E]vidence need not be perfect to avoid application of the plain error doctrine." *Id.* ¶ 49.

¶ 51    Rule 431 governs *voir dire* examination of potential jurors, and Rule 431(b) provides that:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that

---

[1]This conclusion should not be confused with a finding that the error was harmless. A forfeited error not constituting second-prong plain error is not the same as a preserved error being harmless beyond a reasonable doubt. *People v. Effinger*, 2016 IL App (3d) 140203, ¶ 43 (citing *People v. Thurow*, 203 Ill. 2d 352, 363 (2003)).

if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 52 Under Rule 431(b), a court may not merely give "a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." Ill. S. Ct. R. 431, Committee Comments (eff. July 1, 2012). As our supreme court has stated, "the language of Rule 431(b) is clear and unambiguous; the rule states that the trial court 'shall ask' whether jurors understand and accept the four principles set forth in the rule. The failure to do so constitutes error." *People v. Belknap*, 2014 IL 117094, ¶ 45. It has found that "the trial court committed error when it failed to ask prospective jurors whether they *both* understood and accepted the principles set forth in Rule 431(b)." (Emphasis in original.) *Id.* ¶ 46. "While *** it is arguable that the trial court's asking for disagreement, and getting none, is equivalent to the jurors' acceptance of the Rule 431(b) principles, the court's failure to ask the jurors whether they understood the principles is error in and of itself." *Id.* ¶ 44. The supreme court has found clear error where the "trial court asked jurors whether they 'had any problems with' or 'believed in' those principles." *Sebby*, 2017 IL 119445, ¶ 49.

¶ 53 Here, we find clear error because the trial court did not ask the venire or prospective jurors if they understood the fourth Rule 431(b) principle: that it cannot be held against a defendant if he or she does not testify. However, we find no plain error because the trial evidence was not closely balanced, as stated above. See *id.* ¶¶ 49-52 (finding "a clear error" under Rule 431(b), holding that a Rule 431(b) violation is generally not second-prong plain error, and "turn[ing] to the trial evidence because a requisite to relief under the first prong is a finding that that evidence was closely balanced").

¶ 54                                    C. Jury Instructions

¶ 55 Lastly, defendant contends that the court erred in not giving the jury the IPI Criminal No. 11.66 instruction as required when evidence is admitted pursuant to the hearsay exception under section 115-10 of the Code of Criminal Procedure of 1963. 725 ILCS 5/115-10 (West 2014).

¶ 56 Section 115-10 provides that, if the trial court admits a hearsay statement pursuant to its provisions, the trial court must instruct the jury that "it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." 725 ILCS 5/115-10(c) (West 2014). IPI Criminal No. 11.66 implements this statutory provision and states:

"You have before you evidence that ____ made statements concerning the offense charged in this case. It is for you to determine whether the statements were made, and, if so, what weight should be given to the statements. In making that determination, you should consider the age and maturity of ____, the nature of the statements, and the circumstances under which the statements were made." IPI Criminal No. 11.66.

¶ 57 Failure to give IPI Criminal No. 11.66 when a statement was admitted under section 115-10 is clear and obvious error. See *People v. Sargent*, 239 Ill. 2d 166, 190 (2010). Thus, even if a defendant fails to seek IPI Criminal No. 11.66 and to challenge the absence of IPI Criminal No. 11.66 in the posttrial motion, the absence of IPI Criminal No. 11.66 may be considered on appeal as a matter of plain error. *Sargent*, 239 Ill. 2d at 188-89. "The erroneous omission of a jury instruction rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *Id.* at 191. However, where the jury was given IPI Criminal No. 1.02 on witness credibility, there was no second-prong plain error because the jury was provided "similar principles regarding the jury's role in assessing witness credibility and the various criteria jurors may consider when making that assessment." *Sargent*, 239 Ill. 2d at 192.

¶ 58 Here, defendant did not seek the IPI Criminal No. 11.66 instruction at trial, nor challenge the absence of IPI Criminal No. 11.66 in her posttrial motion. Thus, we may consider this contention only as plain error that, in light of *Sargent*, would have to be first-prong plain error. However, as stated above, we find the trial evidence here to not be closely balanced. That analysis does not change because Shontrell's pretrial statements admitted under section 115-10 are part of that trial evidence, as this jury received the same witness credibility instruction, IPI Criminal No. 1.02, as in *Sargent*.

> "[W]e may consider the hearsay outcry statements on the prosecution's side of the scale as we determine whether the evidence was closely balanced for purposes of plain error review and whether the omitted instruction was the error that tipped the scales of justice against defendant, in light of the fact that a similar, though not identical, instruction was given." *People v. Marcos*, 2013 IL App (1st) 111040, ¶ 71 (citing *Sargent*, 239 Ill. 2d at 194).

Thus, we find no plain error here.

¶ 59                                         IV. CONCLUSION
¶ 60 Accordingly, we affirm the judgment of the circuit court.

¶ 61 Affirmed.

¶ 62 JUSTICE CONNORS, dissenting:

¶ 63 I disagree with the majority that the trial court's instructions and admonishment were sufficient to cure the defects in the oath sworn by this jury. There was no trial jury oath sworn by this jury. Accordingly, I respectfully dissent.

¶ 64 The process of obtaining a jury for trial begins with the summoning of a jury panel, which is the group of people from which the trial jury is selected. When this group has assembled in the courtroom, an oath is administered to all members that they will answer truthfully all questions concerning their qualifications as trial jurors. This oath is often called the *voir dire* oath. A jury is then selected from this group. Before the trial properly begins, an oath is administered to the jurors selected for the trial that they will truly weigh the evidence and render a true verdict according to the evidence. This may be called the trial oath, to distinguish it from the *voir dire* oath.

¶ 65 The administration of the trial oath marks a highly significant moment in the case. A defendant is not placed in jeopardy until a jury has been sworn to try a case: "[U]ntil that moment, a defendant is subject to no jeopardy, for the twelve individuals in the box have no power to convict him." *United States v. Green*, 556 F.2d 71, 72 (D.C. Cir. 1977) (citing *Breed v. Jones*, 421 U.S. 519 (1975), and *Serfass v. United States*, 420 U.S. 377 (1975)). Jeopardy attaches at the time after which the defendant may not be reprosecuted on the same claim, whether the defendant is acquitted or convicted. *Crist v. Bretz*, 437 U.S. 28, 38 (1978).

¶ 66 Further, in *Patton v. Yount*, 467 U.S. 1025 (1984), the United States Supreme Court confirmed that it is the trial oath that provides the defendant an impartial jury by obligating jurors to set aside any previous knowledge or bias. In reviewing whether a juror should have been excused for cause, the Supreme Court held that the key question was whether the juror swore "that he could set aside any opinion he might hold and decide the case on the evidence." *Id.* at 1036. A year later, in *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), the Supreme Court stated that the proper standard for determining when a prospective juror may be excluded for cause "is whether the juror's views would 'prevent or substantially impair the performance of his *duties as a juror* in accordance with his instructions and his *oath*' " (emphases added) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Thus, the trial oath has implications for when jurors can be excused. Ultimately, upon being impaneled, an oath legally commences the office of the juror. *United States v. Olano*, 507 U.S. 725, 740 (1993). A jury is not a jury until it is sworn to the trial oath—not the *voir dire* oath. Both section 115-4(g) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-4(g) (West 2014)) ("Trial by Court and Jury"), and Illinois Supreme Court Rule 434(e) (eff. Feb. 6, 2013) ("Jury Selection"), require that a jury be impaneled and sworn. Here, the jurors were never asked to swear or affirm to well and truly try the matters at issue and render a true verdict according to the law and evidence.

¶ 67 The solemnity of the trial oath awakens the conscience of the jurors and impresses on them their serious duty. *State v. Arellano*, 1998-NMSC-026, ¶ 43, 125 N.M. 709, 965 P.2d 293 (McKinnon, J., dissenting, joined by Minzner, J.). I believe that the failure to properly swear the jury—that is, administer the trial oath—is structural error. Of note, during defendant's motion for a new trial, the State conceded that the error was structural and could not be waived. A criminal defendant has a constitutional right to a trial by an impartial jury. *People v. Encalado*, 2018 IL 112059, ¶ 24 (citing *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)). The trial oath is designed to protect that fundamental right. *Arellano*, 1998-NMSC-026, ¶ 41 (McKinnon, J., dissenting, joined by Minzner, J.). And, the Maryland Court of Appeals has found that it was structural error to be tried by an unsworn jury, not subject to waiver or harmless error analysis. *Harris v. State*, 956 A.2d 204, 209-11 (Md. 2008). Notably, *Harris* differentiated between cases where the jury was sworn at some point and cases where the jury had not been sworn at all. *Harris* also stated that "the appellate courts in other states, almost unanimously, hold that the complete failure to swear the jury can never be harmless error." *Id.* at 213.

¶ 68 Nonetheless, the majority states, "[w]e are faced with a clear error of a trial [court] by a jury never sworn to try the case" (*supra* ¶ 42), but then decides without in-depth analysis that the trial court's admonishments and instructions were sufficient to cure the error. The majority also mentions, but does not elaborate on, the numerous jurisdictions that have found an unsworn jury to be structural error and not subject to forfeiture or harmless error. The majority finds significant the analysis in *People v. Cain*, 869 N.W.2d 829 (Mich. 2015). However, I

find *Cain* compelling because of the research and reasoning in the dissent, which provides a careful history of the trial oath and a thorough explanation of the conclusion that the sixth amendment to the United States Constitution guarantees the right to a sworn jury and that a defendant tried without a sworn jury is deprived of constitutional protection. *Id.* at 840-58 (Viviano, J., dissenting, joined by McCormack, J.). The majority fails to recognize the significance of being tried by a jury that has been administered the trial oath. Failure to give the oath not only affects the defendant's rights, including as they pertain to double jeopardy, but also precludes an impartial jury.

¶ 69　　In *People v. Cole*, 54 Ill. 2d 401, 411 (1973), our supreme court stated that "[t]he right to a trial by an impartial tribunal is so basic that a violation of the right requires a reversal." In my view, the failure of the jury to receive the trial oath is structural plain error.

¶ 70　　Under the second prong of plain error review, "[p]rejudice to the defendant is presumed because the importance of the right involved, '*regardless* of the strength of the evidence.' " (Emphasis in original.) *People v. Herron*, 215 Ill. 2d 167, 187 (2005) (quoting *People v. Blue*, 189 Ill. 2d 99, 138 (2000)). In *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009), the court equated the second prong of plain error with structural error, asserting that "automatic reversal is only required where an error is deemed 'structural,' *i.e.*, a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial' " (quoting *Herron*, 215 Ill. 2d at 186).

¶ 71　　For these reasons, I dissent and would hold that the trial oath is essential to legally form a jury.